**No. 26-3069**

In the
# United States Court of Appeals
# for the Ninth Circuit

In re: DMCA Section 512(h) Subpoena to Google LLC

NIMA GHARAVI,

*Petitioner-Appellant,*

v.

GOOGLE LLC,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-mc-80164-WHO
Hon. William H. Orrick

**APPELLANT'S OPENING BRIEF**

Nima Gharavi
4610 North Clark St. #1098
Chicago, IL 60640
Phone: +1 (773) 899-4688
nima@rightcallofficialsinc.com
*Petitioner-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ..............................................................................1

JURISDICTIONAL STATEMENT ......................................................3

ISSUES PRESENTED.........................................................................3

STATUTORY AND RULE AUTHORITIES .......................................4

STATEMENT OF THE CASE.............................................................4

    A. The Subpoena. ..........................................................................4

    B. Notifications and Production. ...................................................5

    C. The July 28 Expansion and Reversal.......................................5

    D. Google's Appearance and Disclosures.....................................5

    E. The Joint Discovery Letter Brief. ............................................6

    F. The Order. .................................................................................8

    G. This Appeal...............................................................................9

SUMMARY OF ARGUMENT ..........................................................10

STANDARD OF REVIEW ................................................................12

ARGUMENT .....................................................................................14

    I. The Text of § 512(h)(3) Resolves This Appeal: The Information Must Be Produced "to the Extent . . . Available to the Service Provider," and the Service Provider Is Google LLC, the Served Entity. ....................................................14

        A. "The Service Provider" Is the Served § 512(k)(1)(B) Entity: Google LLC, Which Was Noticed, Appeared, and Partially Complied. ..............14

        B. "Available to the Service Provider" Measures Availability Across the Entity's Records; the Statute Contains No Product-Level Carve-Out.....16

ii

C. The Undisputed Record and Google's Own Contracts Confirm the Entity-Level Reading.................................................................................24

II. *Cox*, *Verizon*, and *Charter* Decide Who May Be Subpoenaed—Not How Much a Proper Recipient Must Search. .........................................................26

    A. All Three Are Threshold Decisions Built on the Effective-Notification Requirement; the Threshold Here Is Conceded. ......................................26

    B. The Order Transposed Threshold Doctrine into a Scope Limitation That No Case Supports. .......................................................................28

    C. Google's Own Conduct Refutes Its Reading.....................................31

III. The Order's Stated Grounds Do Not Withstand Review. ...........................34

    A. "Does Not Appear to Perform Any Storage Function" Is Not the § 512(a) Test, and the Test Was Never Applied. .......................................34

    B. The Statute's Architecture Refutes a Storage-or-Conduit Binary.......37

    C. A Court of the Same District Applied the Test the Order Skipped.....38

    D. The "Distinct Entity" Rationale Fails on This Record. .......................38

IV. The Rule 45 Alternative the Order Invoked Is Illusory. .............................40

    A. A Doe Complaint Requires the Very Facts the Subpoena Seeks........41

    B. The Produced Data Cannot Fill the Gap; the Verified Layer Sits with AdSense. ..............................................................................................44

    C. The Remaining Paths Are Closed, and § 512(h) Already Carries Rule 45's Safeguards. ..................................................................................45

CONCLUSION.............................................................................................47

STATEMENT OF RELATED CASES.................................................................48

CERTIFICATE OF COMPLIANCE.....................................................................49

ADDENDUM .......................................................................................... A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AF Holdings, LLC v. Does 1–1058*,
752 F.3d 990 (D.C. Cir. 2014)................................................................41

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*,
148 F.3d 1080 (D.C. Cir. 1998)............................................................41

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993)...............................................................................18

*Cobbler Nev., LLC v. Gonzales*,
901 F.3d 1142 (9th Cir. 2018) ..............................................................45

*Columbia Ins. Co. v. seescandy.com*,
185 F.R.D. 573 (N.D. Cal. 1999) .........................................................42

*Cordova v. 1 Doe*,
2025 WL 2262999 (N.D. Cal. July 11, 2025) ......................................43

*Cordova v. Huneault*,
2025 WL 2535104 (N.D. Cal. July 16, 2025) ......................................33

*Cordova v. Huneault*,
2025 WL 2637504 (N.D. Cal. Sept. 12, 2025).....................................32

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) ................................................................42

*Harris v. Bd. of Supervisors, Los Angeles Cnty.*,
366 F.3d 754 (9th Cir. 2004) ................................................................34

*In re Aimster Copyright Litig.*,
252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003)...35

*In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*,
393 F.3d 771 (8th Cir. 2005) .................................................... passim

*In re DMCA § 512(h) Subpoena to Dynadot Inc.*,
No. 3:25-mc-80138-TLT (N.D. Cal. Aug. 13, 2025)....................................38

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*,
608 F. Supp. 3d 868 (N.D. Cal. 2022)...........................................................23

*In re Grand Jury Subpoena, Dated Apr. 18, 2003*,
383 F.3d 905 (9th Cir. 2004) .......................................................................12

*In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC*,
148 F.4th 1056 (9th Cir. 2025).............................................................. passim

*Nu Image, Inc. v. Does 1–23,322*,
799 F. Supp. 2d 34 (D.D.C. 2011).................................................................41

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
351 F.3d 1229 (D.C. Cir. 2003).............................................................. passim

*Republic of Ecuador v. Mackay*,
742 F.3d 860 (9th Cir. 2014) .......................................................................13

*Russello v. United States*,
464 U.S. 16 (1983).......................................................................................17

*Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*,
791 F.2d 202 (D.C. Cir. 1986).....................................................................18

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) .....................................................................35

*United States v. Exxon Mobil Corp.*,
943 F.3d 1283 (9th Cir. 2019) .....................................................................14

*United Transp. Union v. BNSF Ry. Co.*,
710 F.3d 915 (9th Cir. 2013) .......................................................................17

*Windstream Servs., LLC v. BMG Rights Mgmt. (US) LLC*,
2017 WL 1386357 (S.D.N.Y. Apr. 17, 2017) ..............................................35

*Zoller v. GCA Advisors, LLC*,
993 F.3d 1198 (9th Cir. 2021) .....................................................................34

v

**Statutes**

17 U.S.C. § 512 ........................................................................................... 17, 37

17 U.S.C. § 512(a) ............................................................................... passim

17 U.S.C. § 512(a)(1) .......................................................................... 35, 36, 38

17 U.S.C. § 512(b)(1) ....................................................................................17

17 U.S.C. § 512(c)(1) ....................................................................................17

17 U.S.C. § 512(c)(3) ....................................................................................27

17 U.S.C. § 512(c)(3)(A) ..................................................................... passim

17 U.S.C. § 512(h) ............................................................................... passim

17 U.S.C. § 512(h)(1) ....................................................................................14

17 U.S.C. § 512(h)(2)(A) ..............................................................................18

17 U.S.C. § 512(h)(2)(C) ..............................................................................46

17 U.S.C. § 512(h)(3) .......................................................................... passim

17 U.S.C. § 512(h)(4) .......................................................................... 14, 18, 46

17 U.S.C. § 512(h)(5) .......................................................................... 15, 18, 31

17 U.S.C. § 512(h)(6) .......................................................................... 12, 33, 46

17 U.S.C. § 512(k)(1)(A) ...................................................................... 11, 35

17 U.S.C. § 512(k)(1)(B) .................................................................... 6, 10, 15, 26

17 U.S.C. § 512(n) ........................................................................................37

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................3

28 U.S.C. § 1338(a) .......................................................................................3

vi

**Rules**

9th Cir. R. 28-2.6 ...................................................................................48

9th Cir. R. 28-2.7 ....................................................................................4

Fed. R. App. P. 4(a)(1)(A) .......................................................................3

Fed. R. Civ. P. 45(a)(3)...........................................................................46

**Other Authoritiess**

Circuit Advisory Committee Note to Rule 27-1 ......................................25

**INTRODUCTION**

This appeal presents a single question of statutory interpretation: when 17 U.S.C. § 512(h)(3) orders "the service provider receiving the notification and the subpoena" to disclose identifying information "to the extent such information is available to the service provider," does that command run to the served service provider—here, Google LLC—or only to whichever internal product the provider designates as the repository of the infringing material?

The threshold questions that occupied *Cox*, *Verizon*, and *Charter* are not in dispute. Google LLC received the § 512(c)(3)(A) takedown notifications at @google.com corporate email addresses, removed the noticed videos, appeared as the subpoena's recipient, and produced identifying information—first the information available to YouTube, and then, voluntarily, Google Account data. ER-8; ER-9; ER-13–ER-14. What Google refused to produce, and what the district court held a § 512(h) subpoena cannot reach, is the information in one further system that, on the undisputed record, Google LLC operates and synchronizes with the others: AdSense. ER-4:22–24; ER-7.

The district court accepted Google's position that a § 512(h) subpoena "cannot compel a service like AdSense, which does not store the allegedly infringing information, to disclose information." ER-3:18–19. It reasoned that "[a]s Google argues, AdSense is a distinct entity from YouTube," ER-4:24, and that

1

AdSense "does not appear to perform any storage function, as Google asserts, which would place it outside the scope of a Section 512(h) subpoena power under Section 512(a)." ER-4:27–ER-5:1. Neither ground survives review. No second entity exists anywhere in this record: every set of terms Google invoked names Google LLC as the sole contracting party, and Google's own certification of interested entities lists no YouTube or AdSense entity. ER-13–ER-14. And § 512(a) is a five-condition test for transitory transmission—a test the order never applied and no record evidence engages.

The question is one of first impression; the district court observed that "[t]here is very little caselaw to guide my decision in this dispute." ER-4:22. The answer will matter beyond this record: on Google's reading, any provider may confine what is "available" by deciding where, among its products, identifying information resides. The dispute is also narrower than it may appear, in a respect Google itself has fixed: Google has never contended that the information does not exist or that producing it would be a burden—it acknowledges disclosing identifying information from AdSense in response to Rule 45 subpoenas, ER-10 n.2, and the order allows that Petitioner "may be permitted to seek information about AdSense," ER-4:23. The only dispute is the vehicle. Because the statute's text resolves that dispute—production runs from the service provider, measured by what is available to the service provider—the order should be reversed.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This miscellaneous proceeding arises under the Copyright Act: it concerns a subpoena issued under 17 U.S.C. § 512(h) to identify alleged copyright infringers. ER-15; ER-20–ER-21.

The Court has jurisdiction under 28 U.S.C. § 1291. *See In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC* ("*Cox*"), 148 F.4th 1056, 1061 (9th Cir. 2025) (exercising § 1291 jurisdiction over an appeal from a district-court order in a § 512(h) subpoena proceeding).

The order appealed from is a final order: it denied the relief sought in the joint discovery letter brief and disposed of all issues in the miscellaneous proceeding, leaving nothing pending before the district court. ER-3–ER-5.

The order was entered on April 8, 2026. ER-3. Petitioner filed the notice of appeal on May 7, 2026, ER-22, the twenty-ninth day of the thirty-day period allowed by Fed. R. App. P. 4(a)(1)(A). The appeal is timely.

## ISSUES PRESENTED

1. Whether § 512(h)(3), which obligates "the service provider" to disclose the subscriber-identifying information "available to the service provider," permits the served provider—Google LLC—to confine its search and production to a single product's database.

3

2. Whether the order's stated grounds—placing AdSense within § 512(a) without applying § 512(a)'s five conjunctive conditions, and the assumed adequacy of a Rule 45 alternative—withstand *de novo* review.

## STATUTORY AND RULE AUTHORITIES

Pertinent statutory and rule authorities are set out verbatim in the addendum bound with this brief. 9th Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A. The Subpoena.

On June 24, 2025, the Clerk of the United States District Court for the Northern District of California issued a subpoena under 17 U.S.C. § 512(h) directed to "Google LLC," 1600 Amphitheatre Parkway, Mountain View, California. ER-15. The subpoena issued on Petitioner's sworn declaration that he owns the copyrights in the motion pictures published to his YouTube channel, that he sent DMCA takedown notices under § 512(c)(3)(A) regarding the alleged infringements, that the subpoena's purpose is to identify the alleged infringers, and that the information will be used solely to protect his rights under Title 17. ER-20–ER-21. Attachment A directed production, for each listed account, of "the name, last known address, last known telephone number, any electronic mail addresses associated with each account from three (3) years to the date of production and any logs of Internet Protocol addresses used to access the subject account(s)" over the

4

same period. ER-16. It sought no financial or payment records. ER-16. The listed accounts are eight YouTube accounts drawn from eight DMCA notices. ER-17–ER-18. The subpoena set compliance for July 18, 2025, at 7:09 p.m. ER-15.

### B. Notifications and Production.

The takedown notifications were sent to and acknowledged by Google LLC at @google.com corporate email addresses. ER-8. Google removed the noticed material from YouTube and produced identifying information from its YouTube product. ER-9; ER-10.

### C. The July 28 Expansion and Reversal.

On July 28, 2025, Google's supplemental production voluntarily expanded to include Google Account data. ER-8. After Petitioner requested AdSense information, Google reversed position, claiming that § 512(h) limits searches to its YouTube product. ER-8. In the joint letter, Google acknowledged that it "has disclosed AdSense billing profiles in response to Rule 45 subpoenas." ER-10 n.2.

### D. Google's Appearance and Disclosures.

On October 13, 2025, Google appeared through counsel as a non-party and filed a combined Rule 7.1 corporate disclosure statement and Civil Local Rule 3-15 certification of interested entities. ER-13–ER-14. The certification lists three entities: Google LLC; XXVI Holdings Inc., its holding company; and Alphabet

Inc., the holding company of XXVI Holdings Inc. ER-14. No YouTube entity and no AdSense entity appears. ER-14.

### E. The Joint Discovery Letter Brief.

On January 12, 2026, the district court resolved the parties' motion practice—granting Google's motion to strike Petitioner's initial motion to compel, denying that motion along with Petitioner's motion for sanctions, and denying Petitioner's motion to strike a paragraph of a Google declaration—and directed the parties to present the discovery dispute in a single joint letter of no more than five pages under its standing orders. ER-29; ER-6.

The parties met and conferred by videoconference on January 21, 2026, without resolving the dispute, and filed the joint letter brief on January 26, 2026. ER-6.

As relevant here, Petitioner's half of the letter presented three grounds.

*First*, Google LLC is the § 512(k)(1)(B) service provider as the operator of YouTube's facilities; it received effective notice under § 512(c)(3)(A); and its certificate of interested entities identifies no separate YouTube or AdSense entities. ER-7. The letter set out integration facts: YouTube channel creation requires a Google account; YouTube monetization requires AdSense integration, with advertising revenue disbursed through AdSense accounts linked to creators' Google accounts; and Google stores and propagates user account information

6

across YouTube, Google Account, and AdSense through integrated databases that synchronize automatically. ER-7. It set out infrastructure facts: Google LLC owns or leases the server hardware hosting YouTube content, is the registered owner of the IP address blocks assigned to YouTube's servers, and is registered as the owner of Autonomous System Number 15169, the routing identifier for YouTube traffic. ER-7.

*Second*, the letter argued that Google conflated two distinct questions— which service providers are subject to § 512(h), and whether a qualifying provider may restrict searches within its integrated operations—and that *Cox*, *Verizon*, and *Charter* answer only the first. ER-8. It argued that Google's contrary reading would create a roadmap for statutory evasion and make the remedy a dead letter. ER-8.

*Third*, it argued that § 512(h)(3) requires production from the service provider itself, not from an artificially constrained subset of the service provider's databases. ER-9.

The letter closed by requesting an order that Google LLC "conduct a search of all systems containing subscriber information for the YouTube accounts identified in the subpoena, including YouTube, Google Account, and AdSense databases," and produce all responsive information. ER-9.

Google's half of the letter responded that § 512(h) creates "a narrow, limited authority" reaching only a service provider "*storing allegedly infringing material*." ER-9. It stated that YouTube—"one of more than 70 products or services offered by Google"—stored and removed the videos, and that Google produced the identifying information available to YouTube. ER-10. It stated that "YouTube does not verify the names and addresses a user provides," so that "verified name and address information is often not available to YouTube." ER-10. It described AdSense as a distinct "service" with which "[u]sers form a separate relationship . . . by agreeing to AdSense Terms and Policies," citing the AdSense terms by URL. ER-10 & n.3. It argued that § 512(h) "does not create a broad, enterprise-wide discovery authority applicable to all products and services owned by a corporate entity," and that *Cox*, *Verizon*, and *Charter* adopt a functional rather than corporate-entity approach. ER-10–ER-11. It asked that the subpoena be quashed to the extent it purports to compel disclosure of AdSense information. ER-11.

**F. The Order.**

On April 8, 2026, the district court denied the relief Petitioner requested. ER-3–ER-5. The order recites the parties' positions: Petitioner "seeks to compel" Google to "conduct a search of all systems containing subscriber information for the YouTube accounts identified in [his] subpoena, including YouTube, Google Account, and AdSense databases," while Google "maintains that a Section 512(h)

8

subpoena 'cannot compel a service like AdSense, which does not store the allegedly infringing information, to disclose information.'" ER-3. The district court observed that "[t]here is very little caselaw to guide my decision in this dispute," ER-4:22, and concluded that "while Gharavi may be permitted to seek information about AdSense, it may not do so through a 512(h) subpoena," ER-4:23–24. It gave two grounds. First: "As Google argues, AdSense is a distinct entity from YouTube—users may 'form a separate relationship . . . by agreeing to AdSense Terms and Policies and can submit different information when registering for AdSense.' . . . And individuals may use YouTube without AdSense, and vice versa." ER-4:24–27 (citation omitted). Second: "AdSense also does not appear to perform any storage function, as Google asserts, which would place it outside the scope of a Section 512(h) subpoena power under Section 512(a)," citing *Cox* as "holding that a DMCA subpoena cannot be issued on an internet service provider who merely transmits the alleged infringing material." ER-4:27–ER-5:2. The order added: "A Rule 45 subpoena is an option for Gharavi, but not until he files a complaint against a party," and "[t]here may be other ways to acquire this information." ER-5:4–6. It concluded that "a Section 512(h) subpoena is the wrong vehicle for Gharavi's goals" and denied the request to compel. ER-5:6–7.

**G. This Appeal.**

Petitioner filed the notice of appeal on May 7, 2026. ER-22.

## SUMMARY OF ARGUMENT

If § 512(h)(3) means what it says, the order must be reversed: Part I is dispositive standing alone, without reaching the order's stated grounds. Parts I and II resolve the first issue presented. Parts III and IV resolve the second, independently defeating each of the order's two stated grounds. Should the Court conclude that any classification question is better addressed in the first instance, an alternative disposition—vacatur and remand—remains available.

I. Section 512(h)(3) orders "the service provider receiving the notification and the subpoena" to disclose information sufficient to identify the alleged infringer "to the extent such information is available to the service provider." Every duty in § 512(h) attaches to that single defined actor. Here that actor is Google LLC: the § 512(k)(1)(B) operator of YouTube's facilities, the entity named on the subpoena's face, the entity that received the notifications at @google.com addresses, appeared, and partially complied. ER-7–ER-10; ER-15. The statute measures production by the entity's records; it contains no product- or database-level carve-out; and the undisputed record describes one entity operating three synchronized databases. ER-7. Google's own published terms confirm it: the master, YouTube, and AdSense terms each name one and the same contracting

10

party—Google LLC. Motion for Judicial Notice ("MJN") Ex. A at 3–4; Ex. B at 4; Ex. C at 2.[1]

II. *Cox*, *Verizon*, and *Charter* decide who may be subpoenaed—their common instrument is the effective-notification requirement—not how much a qualifying recipient must search. The threshold those cases police is conceded here. The order nonetheless transposed *Cox*'s threshold holding into a scope limitation, ER-4:27–ER-5:2—the very conflation Petitioner's half of the letter had identified in advance, ER-8. Google's own conduct refutes its reading: its July 28 expansion to Google Account data, its reversal when AdSense was requested, and its acknowledged Rule 45 disclosures of AdSense identifying information. ER-8; ER-10 n.2.

III. The order's stated grounds fail on *de novo* review. "Does not appear to perform any storage function" is not the § 512(a) test. ER-4:28. Section 512(a) turns on transitory transmission and five conjunctive conditions, none applied below and none supported by any evidence. The finding rests on "as Google asserts," ER-4:28, under a joint-letter procedure that, absent leave of court, permitted no affidavits or exhibits beyond the discovery requests and responses. And § 512(a)'s own narrower "service provider" definition, § 512(k)(1)(A), went

---

[1] Pin citations to the exhibits use each exhibit's physical pagination, counting its cover sheet as page 1.

11

unmentioned. The safe harbors are "not status-based," *Cox*, 148 F.4th at 1067, so non-storage cannot itself place a product in § 512(a). And the "distinct entity" rationale collapses on this record: Google's own certification lists no YouTube or AdSense entity, ER-13–ER-14.

IV. The Rule 45 alternative the order invoked is illusory. A Doe complaint requires a good-faith basis for personal jurisdiction—the very identity and location facts the subpoena seeks. The data Google produced cannot supply them: by Google's own account, "verified name and address information is often not available to YouTube," ER-10, while the verified identity layer for monetizing publishers sits with AdSense. The IP trail dead-ends at conduit ISPs that *Cox* places beyond § 512(h). And § 512(h)(6) already imports Rule 45's safeguards. Google has never contended that the information does not exist or would burden it; the order itself allows that Petitioner "may be permitted to seek" it. ER-10 n.2; ER-4:23. The dispute is the vehicle, and the proposed alternative cannot be driven.

This appeal presents a question of first impression: no court of appeals has resolved whether a provider that concededly qualifies under § 512(h) may confine its search and production to a single product's databases.

## STANDARD OF REVIEW

The questions presented are reviewed *de novo*. Orders granting or denying a motion to quash a subpoena are generally reviewed for abuse of discretion. *In re*

*Grand Jury Subpoena, Dated Apr. 18, 2003*, 383 F.3d 905, 909 (9th Cir. 2004). But in *Cox*, reviewing an order in a § 512(h) subpoena proceeding, the Court distinguished the applicable standards: whether a § 512(h) subpoena may properly issue to a § 512(a) service provider "is a matter of statutory interpretation that we review de novo," while subsidiary factual findings are reviewed for clear error. 148 F.4th at 1061.

Every question presented is legal: the scope of § 512(h)(3)'s disclosure command and the legal test that governs § 512(a) placement. *Cox* found no clear error in the classification before it because "the parties did not meaningfully dispute the role Cox played with respect to the alleged infringement," so "the district court did not need any additional evidence." 148 F.4th at 1069. This appeal presents the converse posture: the premise entered the order as one party's assertion, no evidence was received, and Part III challenges the placement not as a clearly erroneous application of § 512(a)'s conditions but as a placement made without applying them—a challenge to the governing legal standard, not to a finding. No factual finding is challenged: the dispositive record facts were never controverted, and the joint-letter procedure received no evidentiary submissions. The order's caption—"Order Re Discovery Dispute"—changes nothing: where a discovery ruling "turns on the legal issue of whether the [district] court properly interpreted the rule's requirements," review is *de novo*, *Republic of Ecuador v.*

13

*Mackay*, 742 F.3d 860, 864 (9th Cir. 2014). And even under abuse-of-discretion review the Court "determine[s] *de novo* whether the district court identified the correct legal rule." *United States v. Exxon Mobil Corp.*, 943 F.3d 1283, 1287 (9th Cir. 2019) (per curiam).

## ARGUMENT

### I. The Text of § 512(h)(3) Resolves This Appeal: The Information Must Be Produced "to the Extent . . . Available to the Service Provider," and the Service Provider Is Google LLC, the Served Entity.

Parts I and II resolve the first issue presented, which was raised in Petitioner's half of the joint letter brief, ER-7–ER-9—including its statement that "[t]he statute requires production of subscriber information from the *service provider*, not from an artificially constrained subset of that service provider's databases," ER-9—and ruled on in the order, ER-4–ER-5. Review is *de novo* (Standard of Review, above).

#### A. "The Service Provider" Is the Served § 512(k)(1)(B) Entity: Google LLC, Which Was Noticed, Appeared, and Partially Complied.

Section 512(h) speaks of a single actor from beginning to end. A copyright owner "may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer." 17 U.S.C. § 512(h)(1). The clerk issues and signs the subpoena and returns it "for delivery to the service provider." *Id.* § 512(h)(4). Upon receipt, "the service provider" must

14

"expeditiously disclose to the copyright owner . . . the information required by the subpoena." *Id.* § 512(h)(5). The subpoena's contents are fixed by § 512(h)(3), set out in full in Part I.B below, which twice names the same actor: "the service provider receiving the notification and the subpoena" is the entity that must disclose, and the measure of its duty is what is "available to the service provider." The definite article and the participial phrase identify one entity—the one that was noticed and served—and the statute supplies that entity's definition once, for the whole section: "[a]s used in this section, other than subsection (a), the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)." *Id.* § 512(k)(1)(B).

On this record, that entity is Google LLC. The subpoena is directed on its face to "Google LLC" at 1600 Amphitheatre Parkway, Mountain View. ER-15. Google LLC operates YouTube's online services and the integrated facilities that enable content storage and monetization, and so qualifies under § 512(k)(1)(B) as the operator of those facilities. ER-7. The § 512(c)(3)(A) takedown notifications were sent to and acknowledged by Google LLC at @google.com corporate email addresses. ER-8; *see* ER-7. Google appeared through counsel as the subpoena's recipient and litigated its scope in its own name. ER-13–ER-14; ER-9–ER-11. And Google partly complied in its own name—removing the noticed videos and

15

producing identifying information from its YouTube product, ER-9; ER-10—

conduct consistent only with its status as the subpoena's obligated recipient.

No other candidate for "the service provider" exists anywhere in the record.

Google's own submission confirms the point in its choice of subjects: it describes

YouTube as "one of more than 70 products or services offered by Google," and it

describes the production as something *Google* made. ER-10. The entity that was

noticed, was served, appeared, objected, and produced is Google LLC. Under §

512(h)(3), the disclosure obligation is that entity's obligation, and the measure of

the obligation is that entity's records.

**B. "Available to the Service Provider" Measures Availability Across the Entity's Records; the Statute Contains No Product-Level Carve-Out.**

Section 512(h)(3) states what the subpoena commands:

The subpoena shall authorize and order the service provider receiving

the notification and the subpoena to expeditiously disclose to the

copyright owner or person authorized by the copyright owner

information sufficient to identify the alleged infringer of the material

described in the notification to the extent such information is available

to the service provider.

17 U.S.C. § 512(h)(3). Three features of this sentence resolve the question

presented.

16

*First*, the provision names one actor, and names it with the definite article. "The service provider receiving the notification and the subpoena" fixes the discloser's identity: the entity that received the § 512(c)(3)(A) notification and the process—not a product, a database, or a brand within that entity. The measure of the duty then attaches to the same noun: disclosure runs "to the extent such information is available to the service provider." Congress used the served entity as the unit of obligation and the unit of availability alike—and elsewhere in § 512, Congress wrote system-level language when it wanted it: subsection (a) reaches material moving "through a system or network controlled or operated by or for the service provider"; subsection (c) reaches material residing "on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a), (c)(1); *see also id.* § 512(b)(1). Section 512(h)(3) contains no such phrase, and that disparate drafting is presumed deliberate: "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 928 (9th Cir. 2013) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). *Verizon* applied the same presumption within § 512 itself: "[w]here different terms are used in a single piece of legislation, the court must presume that Congress intended the terms [to] have different meanings." 351 F.3d at 1235

17

(quoting *Transbrasil S.A. Linhas Aereas v. Dep't of Transp.*, 791 F.2d 202, 205 (D.C. Cir. 1986)). Nor is the omission mere drafting economy: the notification enters § 512(h) as a filing prerequisite for issuance, § 512(h)(2)(A), (h)(4), not as the measure of the duty, and § 512(h)(3) invokes the notification only to identify the material whose infringer must be named. The availability clause runs to the entity, not to any system within it.

*Second*, the disclosure command is emphatic. The recipient must disclose "notwithstanding any other provision of law and regardless of whether the service provider responds to the notification." *Id.* § 512(h)(5). *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (the use of a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section"). A provision that overrides other law in favor of disclosure is not naturally read to harbor an unwritten license to withhold responsive information based on where, within the recipient, the information resides.

*Third*, "to the extent such information is available to the service provider" is a ceiling on the duty, not a tool in the recipient's hands. It excuses the provider from producing what the provider does not have; it does not authorize the provider to define what it "has" by drawing internal lines. The subpoena's requests track the statutory categories: Attachment A seeks, for each listed account, the name, last

18

known address, last known telephone number, associated email addresses, and logs of IP addresses used to access the account—ordinary components of "information sufficient to identify the alleged infringer." ER-16. The listed accounts are eight YouTube accounts identified in eight DMCA notices. ER-17–ER-18. Those are categories of subscriber-identifying information keyed to accounts, not to products, and nothing in the subpoena or the statute confines the search for them to the database of the product on which the material appeared.

A narrower defense of Google's position fares no better. The phrase "the alleged infringer of the material described in the notification," the argument would run, ties the duty to the noticed material, so that "available to the service provider" means available to the provider in its capacity as host of that material. But the two clauses do different work. "The alleged infringer of the material described in the notification" fixes whose identity must be disclosed—the person behind the noticed accounts; it says nothing about which internal system supplies the information. The infringer is a person, and "information sufficient to identify" that person is measured by what the served entity holds about the person, wherever held. The limit is one of category, not of system: the subpoena sought identity fields—name, last known address, last known telephone number, email addresses, and logs of IP addresses used to access the accounts, ER-16—not content, and not records unrelated to identifying the noticed accounts' operators. The notification

19

does its limiting work at the threshold, where it determines to whom a subpoena may issue at all. Reading it to cabin the search as well would reintroduce, by implication, the system-level language Congress wrote into §§ 512(a) and 512(c)(1) and left out of § 512(h)(3)—and would do so through a phrase addressed to the infringer's identity, not the provider's records.

The undisputed record then supplies the geography of Google LLC's records (Figure 1, Panel A). Google "stores and propagates user account information across YouTube, Google Account, and AdSense systems through integrated databases that synchronize automatically." ER-7. YouTube channel creation requires a Google account; YouTube monetization requires AdSense integration, with advertising revenue disbursed through AdSense accounts linked to creators' Google accounts. ER-7. Information held in those databases is, in the statute's words, "available to the service provider": Google LLC operates every one of them. ER-7.

The record's own vocabulary confirms the reading. Google's position below (Figure 1, Panel B) was that it produced "the identifying information that is available to YouTube," and that "verified name and address information is often not available to YouTube." ER-10. But YouTube is not the statutory actor. The availability clause runs to "the service provider," and Google has never contended—not in its half of the letter, and not in the order's recitation of its

20

position—that the information is unavailable to Google LLC. *See* Part IV.B, below. Substituting "YouTube" for "the service provider" changes the statute's operative noun, and nothing in the text authorizes the substitution.

Consider what the reading licenses. Nothing in it would stop a provider from chartering a new internal product—call it "Identity Manager" (Figure 1, Panel C)—assigning to that product every record that identifies its users, and leaving behind, in each hosting product, only an internal account number. On Google's construction, a § 512(h) subpoena served on the entity would then yield an account number and nothing more: the identifying information would sit, by design, in a product that does not store the noticed material and would therefore lie, on the order's reasoning, beyond the subpoena's reach. "[I]nformation sufficient to identify the alleged infringer," § 512(h)(3), would mean whatever the provider elected to leave in the noticed product—and nothing would confine the technique to one provider. That is not a strained misuse of Google's rule; it is Google's rule, applied by the party that writes the org chart. Petitioner made the point below: the reading creates "a roadmap for statutory evasion." ER-8.

The distance between Figure 1's first panel and its last measures the surrender: Congress wrote a statute that identifies infringers; the order's construction returns a dead end.



**Figure 1.** Panel A shows the statute working as designed: Google LLC holds the

account's identifying information; each product holds a fragment—all of it within

the subpoena's reach. ER-7; ER-10 & n.2. Panel B shows Google's reading: the

subpoena reaches only YouTube. Panel C shows an example of what the order's

construction would incentivize: by moving every identifying record into a product

the subpoena cannot reach, a provider need never disclose an identity—§ 512(h)

22

yields only an account number that identifies no one, and the remedy becomes a dead letter.

The entity-level construction also fits the provision's purpose as the district court itself framed it: § 512(h) provides a "streamlined procedure through which copyright holders may subpoena internet service providers . . . for information identifying an alleged copyright infringer." ER-3:21–24 (quoting *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 877 (N.D. Cal. 2022)). The subsection's own heading announces the function: "Subpoena To Identify Infringer." 17 U.S.C. § 512(h). A streamlined identification mechanism presupposes that the one served entity canvasses its own records once. On Google's reading, every § 512(h) case would instead open with litigation about the recipient's internal organization—which products exist, which databases each keeps, where identity records reside—questions only the recipient can answer, with answers that shift at every reorganization. A statute built to shortcut discovery would require discovery about the provider before any discovery from it.

The statute's allocation of the search confirms the reading. Which of the noticed accounts monetize—and so which carry the fuller identifying records that monetization requires—is knowable only to Google; monetization runs through AdSense accounts linked to creators' Google accounts. ER-7. A copyright holder cannot name the internal database where identity records sit; the served provider,

uniquely, can. Section 512(h)(3) therefore places the duty on "the service provider receiving the notification and the subpoena" and measures it by that provider's records: the statute assigns the search to the only party holding the map. Google's reading inverts that design—the party commanded to disclose becomes the party that decides what "available" means, and the requester, who cannot see behind the wall, has no way to test the answer.

### C. The Undisputed Record and Google's Own Contracts Confirm the Entity-Level Reading.

Three independent bodies of evidence identify Google LLC as the only entity in the frame.

*First*, the integration and infrastructure facts. The systems the subpoena implicates operate as one whole: channel creation requires a Google account, monetization requires AdSense, and account data synchronizes automatically across the three databases, with updates propagating among them. ER-7. Google LLC owns or leases the server hardware hosting YouTube content; it is the registered owner of the IP address blocks 142.250.0.0/15, 172.217.0.0/16, and 2607:F8B0::/32, which are assigned to YouTube's servers; and it is registered as the owner of Autonomous System Number 15169, the routing identifier that determines which entity operates the network infrastructure. ER-7.

*Second*, Google's own disclosure filings. Google's combined Rule 7.1 disclosure and Civil Local Rule 3-15 certification—which required identification

24

of persons and entities with a financial or non-financial interest in the subject matter or a party—lists exactly three entities: Google LLC, XXVI Holdings Inc., and Alphabet Inc. ER-13–ER-14. No YouTube entity and no AdSense entity appears. ER-14. Google's disclosure statement in this appeal is consistent, disclosing the same three-entity chain. DktEntry 3.1 at 1.

*Third*, Google's published contracts name one and the same counterparty. These documents are the subject of Petitioner's contemporaneously filed MJN and are cited with the understanding that the Court may strike the references if notice is declined. *See* Circuit Advisory Committee Note to Rule 27-1, ¶ (7). The Google Terms of Service state, under the heading "Service provider," that "Google services are provided by, and you're contracting with: Google LLC," MJN Ex. A at 3, and provide, under "Your relationship with Google," that "[w]hen we speak of 'Google,' 'we,' 'us,' and 'our,' we mean Google LLC and its affiliates," *id.* at 4. The YouTube Terms of Service state: "The entity providing the Service is Google LLC . . . (referred to as 'YouTube', 'we', 'us', or 'our')." MJN Ex. B at 4. And the AdSense Online Terms of Service—the instrument Google's half cited by URL, ER-10 n.3—state: "'We,' 'us' or 'Google' means Google LLC, and the 'parties' means you and Google." MJN Ex. C at 2. Different papers; one party. A user who "agree[s] to AdSense Terms and Policies," ER-10, contracts with Google LLC, just as a user who accepts YouTube's terms contracts with Google LLC. The separate-

25

terms architecture Google described below is a set of contracts with a single counterparty—the counterparty that was served.

The construction is therefore straightforward on text and record alike: the subpoena's addressee is the § 512(k)(1)(B) service provider; the service provider is Google LLC; and § 512(h)(3) obligates Google LLC to disclose the identifying information available to Google LLC. Under the text, that ends the inquiry—and requires reversal. The contrary authorities and grounds the order invoked are addressed in Parts II and III.

## II. *Cox*, *Verizon*, and *Charter* Decide Who May Be Subpoenaed—Not How Much a Proper Recipient Must Search.

Part II completes the first issue's resolution. Below, Petitioner's half of the letter warned that "Google conflates two distinct questions"—which providers may be subpoenaed, and how much a subpoenaed provider must search. ER-8. The order resolved that dispute against Petitioner, ER-4–ER-5; the point is preserved, and review is *de novo*.

### A. All Three Are Threshold Decisions Built on the Effective-Notification Requirement; the Threshold Here Is Conceded.

*Cox* is the controlling authority closest to this appeal, and Petitioner addresses it directly. *Cox* holds that "the DMCA does not permit a § 512(h) subpoena to issue to a § 512(a) service provider." 148 F.4th at 1067. Its logic is the notification requirement: because § 512(a) providers "by definition, are not entities

26

that store infringing material or link users to a location where infringing material is stored, copyright holders cannot give § 512(a) service providers effective (c)(3)(A) notifications," and "without an effective (c)(3)(A) notification, a copyright holder cannot obtain a valid § 512(h) subpoena." *Id.* The earlier circuit decisions run on the same rail. *Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.* ("*Verizon*"), 351 F.3d 1229, 1233 (D.C. Cir. 2003), concluded that "a subpoena may be issued only to an ISP engaged in storing on its servers material that is infringing or the subject of infringing activity," because "[d]efine all the world as an ISP if you like, the validity of a § 512(h) subpoena still depends upon the copyright holder having given the ISP, however defined, a notification effective under § 512(c)(3)(A)," *id.* at 1236. And *In re Charter Commc'ns, Inc., Subpoena Enforcement Matter* ("*Charter*"), 393 F.3d 771, 777 (8th Cir. 2005), adopted *Verizon*'s reasoning and held that "because the parties do not dispute that Charter's function was limited to acting as a conduit for the allegedly copyright protected material, we agree § 512(h) does not authorize the subpoenas issued here." *See id.* at 776–77 (the notice-and-takedown provision does not apply to § 512(a) providers). *Verizon*'s structural conclusion—that the cross-references to § 512(c)(3) "lead inexorably to the conclusion that § 512(h) is structurally linked to the storage functions of an ISP and not to its transmission functions," 351 F.3d at 1237—is the same threshold point in structural dress: the D.C. Circuit derived the

27

linkage from the impossibility of giving a conduit an effective notification, *id.*, and the linkage therefore identifies which providers may be subpoenaed at all. Google LLC, which received effective notifications and acted on them, is such a provider.

Each case, in other words, asks a threshold question: is the served provider the kind of provider § 512(h) can reach at all? Each answers it through the effective-notification requirement, and in each the answer was no because the provider before the court acted only as a conduit. None involved a provider that received an effective notification, acted on it, and produced. None asked—because none had occasion to ask—how much of its own records a qualifying, served, noticed provider must search.

Here, the threshold those cases police is conceded. As shown in Part I.A, Google LLC received the § 512(c)(3)(A) notifications at @google.com addresses, removed the material, and produced YouTube-available identifying information. ER-8; ER-9. The question the threshold cases answer is not in dispute in this appeal.

### B. The Order Transposed Threshold Doctrine into a Scope Limitation That No Case Supports.

Petitioner's half of the letter framed the error before it occurred: "Google conflates two distinct questions: which service providers are subject to § 512(h), and whether qualifying providers may arbitrarily restrict searches within their

28

integrated operations. *Cox*, *Verizon*, and *Charter* answer only the first question." ER-8.

The pin cites document the transposition. Google's half deployed *Cox*'s function sentence as a scope rule: quoting "'[w]hat matters is the function performed with respect to the alleged infringement at issue,' *Cox*, 148 F.4th at 1067," it reasoned that "AdSense does not perform a storage function with respect to the alleged infringement at issue" and concluded that "[t]herefore, Mr. Gharavi cannot use a Section 512(h) subpoena to compel Google to disclose identifying information maintained by AdSense." ER-11; *see* ER-10 (deploying *id.* at 1062–63 and 1067 for a storage-only reading of the subpoena authority). The order then adopted that placement: AdSense "does not appear to perform any storage function, as Google asserts, which would place it outside the scope of a Section 512(h) subpoena power under Section 512(a)," citing *Cox*, 148 F.4th at 1067, as "holding that a DMCA subpoena cannot be issued on an internet service provider who merely transmits the alleged infringing material." ER-4:27–ER-5:2.

The order's parenthetical is faithful to *Cox*; the application is not. The cited page resolves *who may be subpoenaed*. In *Cox*, the "function performed" inquiry determined whether a § 512(h) subpoena could reach Cox—a conduit ISP—at all. 148 F.4th at 1067. Nothing at that page, and nothing anywhere in *Cox*, addresses how much of its own records a concededly qualifying provider must search once

29

validly subpoenaed. Transposed here, the same sentence is made to perform a different operation. The order took a rule that sorts recipients and used it to sort databases within a recipient. The threshold sentence tells a court which provider the subpoena may reach; it does not license the reached provider to answer from a fraction of its records.

Cox's footnote 6 confirms the division of labor. Capstone pointed to Cox's advertised cloud-storage services to defeat the § 512(a) classification, and the panel answered that "whether Cox has the ability to provide storage is only pertinent if Capstone alleged that Cox stored the infringing material at issue." 148 F.4th at 1069 n.6. Within the threshold inquiry, that is exactly right: capabilities no notification concerns cannot make a provider subpoenable, because the notification is the instrument that opens § 512(h) (Part II.A, above). The footnote sorts providers by the role played in the noticed infringement; it does not address—and had no occasion to address—how much of its records a provider validly reached must search. Here the notifications did concern Google's storage role, the subpoena validly issued to Google LLC, and the footnote's work was done.

The consequences of the transposition were also identified below. On Google's reading, a provider that maintains functional integration for business purposes—"requiring linked accounts, synchronized data, and unified infrastructure"—could simultaneously claim that internal separation "permits

30

selective disclosure searches, rendering § 512(h) meaningless"; the letter called this "a roadmap for statutory evasion" whose "siloing problem would make the remedy a dead letter." ER-8.

The reading also erases statutory text. If production were limited, as a matter of law, to the records of the product that stored the material, then § 512(h)(3)'s measure—"available to the service provider"—would do no work: Congress's chosen yardstick, the served entity's records, would be silently replaced by a different one, a product's records, that appears nowhere in the section. And § 512(h)(5)'s command to disclose "notwithstanding any other provision of law" would yield to something less than law: the recipient's internal allocation of data among its products. A construction that rewrites one clause and hollows a second is not an interpretation of § 512(h); it is an amendment to it. The trilogy's own discipline says as much: *Charter* held that a court is "bound to interpret the terms of the statute and not to contort the statute." 393 F.3d at 777. And the restraint runs in one direction here: in each of those cases the copyright holder asked the court to reach beyond the statute's text and was refused; in this case every textual condition is conceded, and it is the recipient that asks for a limit the text nowhere states.

### C. Google's Own Conduct Refutes Its Reading.

Google's practice does not match Google's position. On July 28, 2025, Google's supplemental production "voluntarily expanded to include Google

31

Account data—yet after Mr. Gharavi requested AdSense information, Google reversed position, claiming § 512(h) limits searches only to its YouTube product." ER-8. If § 512(h) confined the search to the storing product's database, the July 28 production exceeded Google's own theory; if it reaches the entity's integrated records, the reversal was unjustified. The two positions cannot both be right. Google has held each in turn.

The same is true across instruments. Google's own footnote states: "Mr. Gharavi correctly observes that Google has disclosed AdSense billing profiles in response to Rule 45 subpoenas. If Mr. Gharavi initiated a case against the alleged infringer, then, under Court supervision and subject to appropriate protections, he could serve a Rule 45 subpoena on Google and, if otherwise permitted by law, Google would disclose AdSense information." ER-10 n.2. The letter documented the same pattern beyond this case: "Google routinely produces this exact information—including AdSense billing profiles with names and addresses—when served with subpoenas issued pursuant to expedited discovery orders in copyright cases." ER-8. The decision the letter cited reflects it: "On August 25, 2025, in response to Mr. Cordova's subpoena, Google identified [a] mailing address as associated with defendants' Google AdSense billing profile." *Cordova v. Huneault*, No. 25-cv-04685-VKD, 2025 WL 2637504, at *3 (N.D. Cal. Sept. 12, 2025). That subpoena issued to "Google LLC d/b/a YouTube," and the authorizing

32

court reviewed its scope before permitting service: it narrowed two demands that reached past identification—one for other users' "social media profile data," one for users who had merely "downloaded" the video—and left intact the command for all identifying information "provided subsequently for billing, administrative or AdSense revenue purposes." *Cordova v. Huneault*, No. 25-cv-04685-VKD, 2025 WL 2535104, at *1 (N.D. Cal. July 16, 2025).

The same entity, holding the same information in the same databases, produces it when the demand arrives under Rule 45 and withholds it when the identical demand arrives under § 512(h). The information does not move between those two events; only the statutory authority invoked on the subpoena changes— and the statute runs both instruments on the same procedural rails in any event. 17 U.S.C. § 512(h)(6); *see* Part IV.C, below. What is "available to the service provider" under one is equally available under the other, so Google's difference in treatment cannot be evidence of a statutory line. It is evidence that no statutory line exists where Google drew one—that the boundary is Google's own, enforced against only the instrument Congress built for copyright owners. And Google's footnote, ER-10 n.2, hands Part IV its three premises: the information exists, it is available, and producing it burdens no one—Google has produced it before. Part IV takes the concession from there.

33

**III. The Order's Stated Grounds Do Not Withstand Review.**

Parts III and IV resolve the second issue presented. Both grounds are the order's own—the § 512(a) placement, ER-4:27–ER-5:2, and the Rule 45 alternative, ER-5:4–6—so challenges to the order's stated reasoning require no independent preservation. And review is *de novo* notwithstanding the grounds' record-based phrasing: no facts are in dispute—the integration, infrastructure, and production facts were asserted below and never controverted, ER-7–ER-11—so "our entire review is de novo." *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1200 (9th Cir. 2021); *see also Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004) (where the district court is alleged to have relied on an erroneous legal premise, the underlying issues of law are reviewed *de novo*).

**A. "Does Not Appear to Perform Any Storage Function" Is Not the § 512(a) Test, and the Test Was Never Applied.**

The order's dispositive legal move is one sentence: "AdSense also does not appear to perform any storage function, as Google asserts, which would place it outside the scope of a Section 512(h) subpoena power under Section 512(a)." ER-4:27–ER-5:1.

That is not the statutory test. Section 512(a) describes a provider "transmitting, routing, or providing connections for" material through its system or network, or engaged in "intermediate and transient storage" in the course of doing so—and it attaches five conjunctive conditions: the transmission must be initiated

34

by another; carried out by an automatic technical process without selection of the material; without selection of recipients except automatically; without retained copies accessible beyond what transmission requires; and without modification of content. 17 U.S.C. § 512(a)(1)–(5). Courts applying § 512(a) apply those conditions. *See Windstream Servs., LLC v. BMG Rights Mgmt. (US) LLC*, No. 16-cv-5015 (KMW) (RLE), 2017 WL 1386357, at *5–6 (S.D.N.Y. Apr. 17, 2017) ("There are five conditions that must be met for a service provider to qualify for the § 512(a) safe harbor," setting out § 512(a)(1)–(5)); *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659–60 (N.D. Ill. 2002) (the transitory-communications provision applies "provided a number of conditions are satisfied" and is "limited to situations 'in which a service provider plays the role of a "conduit" for the communications of others'" (citation omitted)), *aff'd*, 334 F.3d 643 (7th Cir. 2003).

Section 512(a) even carries its own, narrower definition of the provider it shelters: "[a]s used in subsection (a), the term 'service provider' means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A); *see also UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1019 (9th Cir. 2013) ("Congress already

35

gives two definitions of 'service provider[s]'—one narrow definition specific to § 512(a), and one broader definition that applies to the rest of § 512."). The order placed AdSense "under Section 512(a)" without engaging that definition either.

Not storing is not transmitting. Section 512(a) is defined by what a provider does—transitory transmission, routing, or connection, under five conditions—not by what it does not do. The absence of a storage function therefore cannot, by itself, "place" anything "under Section 512(a)." Yet the order performed no analysis under § 512(a)(1)–(5), and the record contains no finding—and no evidence—that AdSense transmits, routes, or provides connections for the allegedly infringing material. What the record does describe is a product that is, in Google's own words, "an advertising and monetization service," ER-10, that maintains billing profiles bearing names and addresses, ER-8; *see* ER-10 n.2, and through which YouTube advertising revenue is disbursed to creators' linked accounts, ER-7—a description in which nothing transmits, routes, or connects.

The genealogy of the finding confirms the problem. The order's premise rests on "as Google asserts," ER-4:28, and the assertions appear in Google's half of the letter, ER-10—a submission made under the district court's standing procedure for discovery disputes, which provides that, absent leave of court, the parties' joint statement is filed without affidavits or exhibits other than the discovery requests and the responses to them (Addendum, Standing Order § 4). The premise thus

entered the order as an assertion, without an evidentiary record and without the statutory conditions ever being engaged.

To be clear about Part III.A's scope: this brief does not ask the Court to decide whether or where AdSense falls within § 512's safe harbors; the disclosure duty runs to the served entity regardless (Part I). The point here is narrower and dispositive of the order's stated ground: the order placed AdSense within § 512(a) without applying § 512(a), and the record before the district court could not support the placement.

**B. The Statute's Architecture Refutes a Storage-or-Conduit Binary.**

The order's reasoning treats non-storage as conferring § 512(a) status. The statute forecloses that binary. "[T]he safe harbors are not status-based and it would be incorrect to say that a service provider 'is' a § 512(a) service provider." *Cox*, 148 F.4th at 1067. A provider "can simultaneously qualify for more than one safe harbor, § 512(n)." *Id.* And "[t]here is no dispute that a § 512(h) subpoena may issue to a § 512(d) service provider." *Id.* at 1068. Congress said the same thing directly: subsections (a) through (d) "describe separate and distinct functions for purposes of applying this section," and qualification under any one "shall not affect a determination" under any other. 17 U.S.C. § 512(n). The statutory universe is not two boxes. Classification under § 512 is functional and non-exclusive, so a finding

of non-storage decides nothing by itself—and the order performed none of the analysis that would decide anything.

### C. A Court of the Same District Applied the Test the Order Skipped.

The contrast with a recent decision of the same district is instructive. In *In re DMCA § 512(h) Subpoena to Dynadot Inc.*, No. 3:25-mc-80138-TLT (N.D. Cal. Aug. 13, 2025), ECF No. 19 at 5–6—a proceeding brought by the same Petitioner, in which the respondent failed to respond to the motion or the court's orders—the district court set out § 512(a)(1)–(5), examined whether the respondent's role satisfied those conditions, found transitory-communications status not established on the record before it, and ordered full compliance with the § 512(h) subpoena. The unopposed posture limits the decision's adjudicative weight, but it sharpens the methodological contrast: even with no adversary pressing the question, the court treated § 512(a) placement as the output of applying the five statutory conditions—not of observing that a product "does not appear to perform any storage function." ER-4:27–28.

### D. The "Distinct Entity" Rationale Fails on This Record.

The order's first ground states: "As Google argues, AdSense is a distinct entity from YouTube—users may 'form a separate relationship . . . by agreeing to AdSense Terms and Policies and can submit different information when registering for AdSense.'" ER-4:24–26. The competing position was squarely before the

38

district court, and the order restated it accurately: in Petitioner's view, "YouTube and AdSense [therefore] are internal product names for services operated by Google LLC, not separate entities that can fragment disclosure obligations." ER-4:6–7. The record resolves the disagreement.

No second entity exists on this record. As shown in Part I.C, Google's own disclosure filings in the district court and in this appeal identify three entities—Google LLC and its two upstream holding companies—and no YouTube or AdSense entity. ER-13–ER-14; DktEntry 3.1 at 1. The operative facts are the facts of one operator: Google LLC operates the facilities, owns the infrastructure, and synchronizes the databases. ER-7.

Nor is the linkage between the accounts and AdSense the happenstance of a customer who holds two unrelated accounts with one company. It is architectural: monetization on YouTube runs through AdSense accounts linked to creators' Google accounts. ER-7. The record describes a designed pipeline in which the monetizing account presupposes the other two. A rationale built on separateness cannot survive a record built on integration.

The separate-relationship evidence self-collapses. As shown in Part I.C, every set of terms Google pointed to names the same and only contracting party—Google LLC: the master terms, the YouTube terms, and the AdSense terms alike. A second contract with the same party is not a second party. And that users "can

39

submit different information when registering for AdSense," ER-4:25–26, describes fields on a registration form, not corporate separateness—the information submitted flows into databases Google LLC synchronizes. ER-7.

The order's remaining observation—that "individuals may use YouTube without AdSense, and vice versa," ER-4:26–27—describes optional use, not separate identity. A user may use one Google LLC product without another; nothing in the record suggests that optional use makes either product an entity. And the statute already accommodates non-overlap: the availability clause is a ceiling (Part I.B), so for any noticed account with no corresponding AdSense record, a search of that system returns nothing, and § 512(h)(3) asks nothing more. The observation describes the statute operating as written; it does not mark a limit on the search the statute commands.

## IV. The Rule 45 Alternative the Order Invoked Is Illusory.

Part IV addresses the order's remaining ground: "A Rule 45 subpoena is an option for Gharavi, but not until he files a complaint against a party." ER-5:4–5. The two sentences preceding that ground concede its answer: "Generally, the types of subpoenas that may be issued prior to the filing of a complaint are quite limited. Section 512(h) is one of them." ER-5:3–4. The order thus recognized § 512(h) as an instrument Congress made available before any complaint exists—the posture this proceeding occupies—and then directed Petitioner to the one instrument

40

available only after a complaint is filed. As with Part III, the ground is the order's own, so no independent preservation is required; review is *de novo*. One structural fact bears noting: in the joint-letter format, Petitioner's half opens the document and Google's half closes it, ER-6–ER-12, so the format permitted Petitioner no reply to the Rule 45 alternative Google advanced there, ER-9.

### A. A Doe Complaint Requires the Very Facts the Subpoena Seeks.

The order makes a complaint the gateway to Rule 45—but the complaint cannot be filed in good faith without the very information the order declined to compel. A plaintiff pursuing discovery to identify unknown defendants must "have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant[s]." *AF Holdings, LLC v. Does 1–1058*, 752 F.3d 990, 995 (D.C. Cir. 2014) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998)); *Nu Image, Inc. v. Does 1–23,322*, 799 F. Supp. 2d 34, 37 (D.D.C. 2011).

The circularity is complete. The facts that ground personal jurisdiction over a Doe defendant—who the infringer is and where the infringer is—are precisely the facts the subpoena seeks: name, address, telephone number, email addresses, IP logs. ER-16. The order's alternative thus assumes the answer to the question it is offered to solve: it directs Petitioner to a procedure whose threshold requires the information whose absence is the reason for the procedure. ER-5:4–5. That is not

an alternative remedy. It is the same locked door, described twice. And the order names no district in which that complaint could be filed, because none can be named on this record: venue and personal jurisdiction follow the defendant, and the defendant's identity and location are precisely the information the order leaves in Google's hands. ER-5:4–5.

The Ninth Circuit's Doe-suit doctrine confirms that circularity; it does not dissolve it. A plaintiff who cannot name a defendant "should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). That opportunity is an exception to the rule that discovery follows service— an exception the district court in *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 577–78 (N.D. Cal. 1999), described as "generally disfavored" in the Ninth Circuit and as resting in the district court's discretion. It is conditioned, moreover, on threshold showings: the plaintiff must "identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court"—a requirement "necessary to ensure that federal requirements of jurisdiction and justiciability can be satisfied," *id.* at 578—and must establish that the suit "could withstand a motion to dismiss," *id.* at 579. Both gates demand what this record lacks. The court in *Columbia Ins. Co.*

authorized identity discovery only after the plaintiff had traced the operative aliases to a named individual whose California domicile indicated that the court likely had jurisdiction over him. *Id.* at 579.

The order's alternative has already been tested in this district. A YouTube creator sued an anonymous infringer and moved for leave to serve a Rule 45 subpoena on Google LLC for the operator's identity. The court denied leave, holding that he had not demonstrated that it likely had personal jurisdiction over the Doe defendant, and stayed the action to permit the filing of a separate § 512(h) proceeding to identify him. *Cordova v. 1 Doe*, No. 25-cv-05207-DMR, 2025 WL 2262999, at *1–2 (N.D. Cal. July 11, 2025). He dismissed the action six months later, the defendant still captioned as a Doe. Notice of Voluntary Dismissal, *Cordova v. 1 Doe*, No. 25-cv-05207-DMR (N.D. Cal. Jan. 6, 2026), ECF No. 8.

The unverified fields Google produced cannot identify a real person suable in federal court (Part IV.B, below), and the one datum a copyright plaintiff could plead without them—an IP address—does not state a claim (Part IV.C, below). The Doe-discovery pathway serves plaintiffs who already hold identifying information; § 512(h) is the instrument Congress provided for obtaining it. The alternative cannot double as its own prerequisite.

43

**B. The Produced Data Cannot Fill the Gap; the Verified Layer Sits with AdSense.**

Google's own words establish that what it produced cannot supply the missing facts: "YouTube does not verify the names and addresses a user provides when signing up for the YouTube service, and users may not provide information that accurately identifies them if they want to post content anonymously or for other reasons. Accordingly, verified name and address information is often not available to YouTube." ER-10. Unverified, possibly pseudonymous fields cannot support a good-faith allegation of a defendant's identity or jurisdictional contacts; Petitioner cannot plead that any court has authority over a person he cannot identify.

Google does not lack verified information; it holds it in a different product of the same entity. Google's published AdSense documentation states: "Google has a responsibility under Chapter 3 of the U.S. Internal Revenue Code to collect tax information from all monetizing publishers and deduct taxes when they generate revenue from buyers in the U.S." MJN Ex. D at 2 (subject to the pending motion; *see* Part I.C, above). The YouTube terms provide likewise, under "Right to Monetize," that "[i]f required by law, Google will withhold taxes from such payments." MJN Ex. B at 10–11. Tax collection and withholding are performed against verified identities, not screen names. On this record and Google's own documents, the verified identity layer for monetizing publishers sits with

44

AdSense—the layer the order's reading walls off from the subpoena (Figure 1, Panel B). Which noticed accounts monetize is a fact only Google knows—it sits in the very systems the order excused Google from searching—and nothing turns on it. Under the statute, the duty runs to whatever Google LLC holds for each noticed account. Under the order, however, even for the accounts that do monetize, the one verified layer is off-limits.

### C. The Remaining Paths Are Closed, and § 512(h) Already Carries Rule 45's Safeguards.

The subpoena's other category is IP logs, ER-16, and that trail ends where *Cox* begins. An IP trail leads to the subscriber's conduit internet service provider—the § 512(a) provider that *Cox* holds is beyond § 512(h). 148 F.4th at 1067. Identification by that route would require a subpoena to the ISP; a § 512(h) subpoena cannot issue to it, and a Rule 45 subpoena is available only in a filed lawsuit—the very lawsuit the missing identity prevents. And an IP address identifies at most a subscriber, not an infringer: "simply establishing an account does not mean the subscriber is even accessing the internet, and multiple devices can access the internet under the same IP address." *Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1146 (9th Cir. 2018) (complaint premised on the defendant's status as the IP subscriber did not plausibly allege that the subscriber was the infringer).

The path is blocked by the safe harbor on one side, personal jurisdiction on the other, and plausibility at its end. The order's remaining suggestion—"[t]here

45

may be other ways to acquire this information," ER-5:5–6—names none, and the record contains none.

Nor do "safeguards" distinguish the instruments. Google urged that Rule 45 discovery is "subject to full judicial oversight and other safeguards such as protective orders," ER-9, and the order recited the position, ER-4:17–19. But § 512(h) subpoenas already carry that machinery: their issuance, service, and enforcement "shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." 17 U.S.C. § 512(h)(6). As to issuance, the comparison favors § 512(h): a Rule 45 subpoena in ordinary discovery issues on the signature of a party's own attorney, Fed. R. Civ. P. 45(a)(3), while a § 512(h) subpoena issues only after the clerk confirms that the notification satisfies § 512(c)(3)(A), that the proposed subpoena is in proper form, and that the accompanying declaration—sworn to the purpose of obtaining an alleged infringer's identity to protect rights under Title 17, § 512(h)(2)(C)—is properly executed, § 512(h)(4). Google nonetheless discloses AdSense identifying information in response to Rule 45 subpoenas. ER-10 n.2. The only difference the order identified is that one instrument requires a complaint Petitioner cannot yet plead. ER-5:4–5.

46

A final observation frames the disposition. Google has never contended that the information does not exist or that producing it would be burdensome; its acknowledged Rule 45 disclosures of AdSense identifying information concede existence and availability (Part II.C, above; ER-10 n.2). The order itself allows that Petitioner "may be permitted to seek information about AdSense." ER-4:23. From the beginning, the dispute has been about the vehicle, never about the existence, location, or burden of the cargo—and the vehicle question is the statutory question that Part I answers.

## CONCLUSION

The Court should reverse and remand with instructions to order Google LLC to conduct a search of all systems containing subscriber information for the YouTube accounts identified in the subpoena, including YouTube, Google Account, and AdSense databases, and to produce the responsive information. ER-9; ER-16–ER-18. In the alternative, the Court should vacate and remand for application of the governing statutory tests in the first instance.

Dated: July 29, 2026            Respectfully submitted,

                                     /s/ Nima Gharavi
                                     Nima Gharavi
                                     *Petitioner-Appellant*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Petitioner states that he is unaware of any related cases currently pending in this Court.

Dated: July 29, 2026           Respectfully submitted,

/s/ Nima Gharavi
Nima Gharavi
*Petitioner-Appellant*

48

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 26-3069

I am the attorney or self-represented party.

**This brief contains** | 10,641 | **words,** including | 122 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

- ◯ complies with the length limit designated by court order dated _____.

- ◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Nima Gharavi | **Date** | 7/29/2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*