**No. 26-3069**

# In The United States Court of Appeals for the Ninth Circuit

NIMA GHARAVI,

*Petitioner-Appellant,*

v.

GOOGLE LLC,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:25-mc-80164
Hon. William H. Orrick

## ANSWERING BRIEF OF RESPONDENT-APPELLEE GOOGLE LLC

Addison W. Bennett
ASHURST PERKINS COIE US LLP
2525 E. Camelback Road
Suite 500
Phoenix, Arizona 85016
(602) 351-8000

Todd M. Hinnen
Lauren Tsuji
ASHURST PERKINS COIE US LLP
1301 2nd Avenue
Suite 4200
Seattle, Washington 98101
(206) 359-8000
Todd.Hinnen@ashurstperkins.com

*Counsel for Respondent-Appellee Google LLC*

## Fed. R. App. P. 26.1 Disclosure Statement

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google is aware of no publicly owned corporation not a party to the appeal that has a financial interest in the outcome of this litigation.

Dated: October 27, 2026

*s/ Todd M. Hinnen*

*Counsel for Respondent-Appellee Google LLC*

# Table of Contents

Introduction ........ 1
Jurisdictional Statement ........ 4
Statement of the Issues ........ 4
Statutory Authorities ........ 4
Statement of the Case ........ 4
I. Statutory Background ........ 4
II. Factual Background ........ 9
Standard of Review ........ 13
Summary of Argument ........ 14
Argument ........ 19
I. A Subsection 512(h) Subpoena for Information Related to YouTube Videos and Accounts Does Not Require Google to Search Other Networks or Systems Owned or Operated by Google ........ 20
A. A subsection 512(h) subpoena can demand information only from the service provider that stored allegedly infringing content and that received a Takedown Notice for that material ........ 21
1. Section 512's text and structure permit subpoenas only to service providers who store allegedly infringing content ........ 22
2. The district court properly limited the scope of Gharavi's subsection 512(h) subpoena to YouTube, the only service that stored or provided access to the allegedly infringing content ........ 26
B. Subsection 512(h)'s purpose and history confirm that the district court was correct to limit the subpoena to YouTube, the only service performing a storage function ........ 30
II. Gharavi's Arguments Lack Merit ........ 34

A. Section 512 provides no support for Gharavi's staggeringly broad entity-based theory because the statute defines obligations of "service providers," not "entities" .......... 36

B. Neither *Cox* nor other relevant precedent can be artificially confined to mere "threshold" questions ..... 43

C. Rule 45 discovery remains available and commonly used in similar situations .......... 46

III. Gharavi's Broad Entity-Based Interpretation Threatens Protected Free Expression and Harms User Trust in Online Platforms .......... 51

Conclusion .......... 55

Certificate of Compliance .......... 56

Certificate of Service .......... 57

Statutory Addendum

## TABLE OF AUTHORITIES

### CASES

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .... 53

*Applied Underwriters, Inc. v. Lichtenegger*,
913 F.3d 884 (9th Cir. 2019) .... 29

*Atl. Richfield Co. v. Christian*,
590 U.S. 1 (2020) .... 39

*Biden v. Nebraska*,
600 U.S. 477 (2023) .... 30

*Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*,
482 F.3d 1157 (9th Cir. 2007) .... 39

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .... 31–32

*Cordova v. 1 Doe*,
No. 25-cv-5207, 2025 WL 2262999
(N.D. Cal. July 11, 2025) .... 47–48

*Cordova v. Huneault*,
No. 25-cv-4685, 2025 WL 2637504
(N.D. Cal. Sept. 12, 2025) .... 50

*Crowley v. Bannister*,
734 F.3d 967 (9th Cir. 2013) .... 47

*Digital Realty Tr., Inc. v. Somers*,
583 U.S. 149 (2018) .... 30

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .... 31

*Garcia v. Holder*,
621 F.3d 906 (9th Cir. 2010) .... 44

**TABLE OF AUTHORITIES (CONTINUED)**

*Gillespie v. Civiletti*,
629 F.2d 637 (9th Cir. 1980) .......... 47, 48

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
527 U.S. 308 (1999) .......... 49

*In re Aimster Copyright Litig.*,
252 F. Supp. 2d 634 (N.D. Ill. 2002) .......... 41

*In re Aimster Copyright Litig.*,
334 F.3d 643 (7th Cir. 2003) .......... 31

*In re Anonymous Online Speakers*,
661 F.3d 1168 (9th Cir. 2011) .......... 52

*In re Charter Commc'ns, Inc.*,
393 F.3d 771 (8th Cir. 2005) .......... *passim*

*In re DMCA Subpoena to Google, LLC d/b/a YouTube*,
No. 25-mc-80192 (N.D. Cal.) .......... 48

*In re DMCA Subpoena to Reddit, Inc.*,
441 F. Supp. 3d 875 (N.D. Cal. 2020) .......... 4, 48

*In re DMCA § 512(h) Subpoena to Twitter, Inc.*,
608 F. Supp. 3d 868 (N.D. Cal. 2022) .......... 52

*In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC*,
148 F.4th 1056 (9th Cir. 2025) .......... *passim*

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 18, 52

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) (en banc) .......... 40

*Minerva Surgical, Inc. v. Hologic, Inc.*,
594 U.S. 559 (2021) .......... 30

**TABLE OF AUTHORITIES**
**(CONTINUED)**


*Miranda B. v. Kitzhaber*,
328 F.3d 1181 (9th Cir. 2003) ........................................ 43

*Moran v. Screening Pros, LLC*,
25 F.4th 722 (9th Cir. 2022) ........................................ 50

*N.L.R.B. v. SW Gen., Inc.*,
580 U.S. 288 (2017) ........................................ 30, 39

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ........................................ 18

*Parsons v. Ryan*,
949 F.3d 443 (9th Cir. 2020) ........................................ 27

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ........................................ 23

*Ray v. Google LLC*,
No. 23-cv-4222, 2023 WL 7305048
(N.D. Cal. Nov. 6, 2023) ........................................ 9

*Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*,
351 F.3d 1229 (D.C. Cir. 2003) ........................................ *passim*

*Rossi v. Motion Picture Ass'n of Am., Inc.*,
391 F.3d 1000 (9th Cir. 2004) ........................................ 32, 54

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ........................................ 47

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........................................ 49, 50

*United States v. Hansen*,
599 U.S. 762 (2023) ........................................ 53

**TABLE OF AUTHORITIES**
**(CONTINUED)**

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) (en banc) .......... 27

*United States v. Johnson*,
256 F.3d 895 (9th Cir. 2001) (en banc) .......... 43

*Wakefield v. Thompson*,
177 F.3d 1160 (9th Cir. 1999) .......... 47

*Zuni Pub. Sch. Dist. No. 89 v. Department of Educ.*,
550 U.S. 81 (2007) .......... 34

**STATUTES**

Digital Millennium Copyright Act,
Pub. L. 105-304, 112 Stat. 2860 (1998) .......... 4

17 U.S.C.

§ 512(a) .......... 6, 7, 14, 23, 29, 40, 43–45

§ 512(b) .......... 6–8, 22–23, 25, 39

§ 512(b)(2)(E) .......... 7, 8, 23

§ 512(c) .......... 6–7, 22, 27, 29

§ 512(c)(1) .......... 7, 23

§ 512(c)(3) .......... 7–8, 14–15, 23–25, 28, 38, 44

§ 512(d) .......... 6–7, 22, 39, 45

§ 512(h) .......... *passim*

§ 512(h)(1) .......... 8

§ 512(h)(2) .......... 8, 24

§ 512(h)(3) .......... 8, 24, 36, 37

**TABLE OF AUTHORITIES**
**(CONTINUED)**


§ 512(h)(4) ........ 8, 24, 31, 49

§ 512(h)(5) ........ 9, 31, 38

§ 512(h)(6) ........ 9

§ 512(i) ........ 41

§ 512(k) ........ 16, 37, 39, 45

§ 512(n) ........ 6–7, 16, 24, 37

28 U.S.C.

§ 1291 ........ 4

§ 1331 ........ 4

**RULES**

9th Cir. R. 28-2.8 ........ 11

Fed. R. Civ. P. 45 ........ 3, 13, 46, 49–50

**OTHER AUTHORITIES**

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126–27 (2012) ........ 39

*AdSense Online Terms of Service (United States)* ........ 51

H.R. Rep. No. 105-551 (II) (1998) ........ 15, 32, 33, 39

N. Richards & W. Hartzog, *Privacy's Trust Gap,* 126 Yale L.J. 1180 (2017) ........ 54

S. Rep. No. 105-190 (1998) ........ 5, 8, 15, 20, 32–33, 39, 41, 54

Testimony of Edward J. Black Before the Subcomm. on Courts & Intellectual Prop., H. Comm. on the Judiciary, 1997 WL 575023 (Sept. 17, 1997) ........ 42

**TABLE OF AUTHORITIES (CONTINUED)**

Testimony of George Vradenburg, III Before the Subcomm. on Telecomms., Trade & Consumer Prot., H. Comm. on Commerce, 1998 WL 315155 (June 5, 1998) ........................................ 42

Testimony of Seth Greenstein Before the Subcomm. on Telecomms., Trade & Consumer Prot., H. Comm. on Commerce, 1998 WL 300261 (June 5, 1998) ........................................ 42

## INTRODUCTION

17 U.S.C. § 512(h), a provision of the Digital Millennium Copyright Act (DMCA), establishes a narrow departure from ordinary litigation discovery rules to address online copyright infringement. It permits a copyright holder to obtain a subpoena from a court clerk that directs an online service provider to disclose information that may identify a potential infringer, without first filing a lawsuit. But subsection 512(h) is not a general-purpose discovery tool. As this Court has explained, this subpoena provision is "inextricably intertwined" with a series of other provisions of Section 512 that limit the proper scope of a subpoena. *In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC,* 148 F.4th 1056, 1063 (9th Cir. 2025) ("*Cox*"). Joining two other courts of appeals, *Cox* explains that subsection 512(h) can only be understood as part of that larger scheme, which defines a service provider's obligations according to "the function the service provider performed with respect to the infringement at issue." *Id*. at 1067; *see Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003); *In re Charter Commc'ns, Inc.*, 393 F.3d 771 (8th Cir. 2005). It holds that a subsection 512(h) subpoena can issue only to a service provider who "store[s] the infringing material at issue." *Cox*, 148 F.4th at 1069 n.6.

The district court correctly followed the statute, as interpreted in *Cox*, to decide this case. Petitioner-Appellant Nima Gharavi alleges that

various YouTube users infringed his copyrights, and he served a subsection 512(h) subpoena on Google LLC (the owner of the YouTube service) for identifying information about the alleged infringers. After Google disclosed the identifying information associated with the relevant YouTube accounts, Gharavi demanded more: he claimed that because one of the YouTube users likely also used a separate Google product—its advertising monetization service, AdSense—Google also had to disclose information from that distinct service. He therefore argued to the district court that Google had to disclose *all* identifying information regarding the user maintained by Google in connection with *any* of its products and services. ER-7–8. Making findings reviewed only for clear error, the district court correctly agreed with Google that AdSense is "distinct" from YouTube, and that only YouTube "perform[s] any storage function" with respect to the allegedly infringing content. ER-4–5. Following *Cox*, the district court held that because *only* YouTube stores the allegedly infringing content, YouTube is the only service provider with response obligations under subsection 512(h).

None of Gharavi's arguments can change that straightforward application of the statutory text, nor the binding precedent of *Cox*. His contrary corporate-entity-wide theory—that "Google LLC" must search all of its networks and systems to comply with subsection 512(h) subpoenas—is inconsistent with both. For one, *Cox* unambiguously rejects this entity-based theory in its holding that a proper subsection 512(h) subpoena is-

sues only to the specific service that "stored the infringing material at issue," even where the service's corporate parent may store other content through other services. 148 F.4th at 1069 n.6. But even aside from that binding law of the Circuit, Gharavi's view entirely wipes out the function-specific approach that the statute demands—rendering superfluous large stretches of the statute that define a service provider's obligations according to its storage function with respect to specific material. Indeed, for that reason, *Cox* and others have rejected materially identical articulations of his precise argument as "border[ing] upon the silly." *Cox*, 148 F.4th at 1065 (quoting *Verizon*, 351 F.3d at 1236).

Gharavi's view of the statute would senselessly transform an exceedingly unusual and narrow *pre-lawsuit* subpoena mechanism into a broad discovery device. Google complies with requests for AdSense data when properly served with discovery requests connected with an underlying lawsuit. If Gharavi wishes to pursue that broader discovery here, he may file a lawsuit and avail himself of the broader subpoena authority of Federal Rule of Civil Procedure 45. As the district court correctly reasoned, subsection 512(h) is simply the "wrong vehicle" for his requests. ER-5.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. *See Cox*, 148 F.4th at 1061; *see also In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 880 (N.D. Cal. 2020) (a subsection 512(h) subpoena challenge is "its own civil case" where the sole issue is whether the subpoena should be enforced).

## STATEMENT OF THE ISSUES

Does a subpoena issued under 17 U.S.C. § 512(h) concerning alleged copyright-infringing videos uploaded to YouTube require Google LLC to respond with information drawn from YouTube—the only service that performs a storage function with respect to the allegedly infringing content—or must Google instead search all of its networks and systems for other products and services that do not perform a storage function with respect to the allegedly infringing content?

## STATUTORY AUTHORITIES

The pertinent statutory authorities are reproduced in the Statutory Addendum to this brief. *See* Add. 1–6.

## STATEMENT OF THE CASE

### I. Statutory Background.

17 U.S.C. § 512 is a provision of the Digital Millennium Copyright Act (DMCA), Pub. L. 105-304, 112 Stat. 2860 (1998). "In enacting § 512, Congress struck a compromise between copyright holders and service providers." *Cox*, 148 F.4th at 1059. When a copyright holder alleges

infringement by a user of an online platform, the statute's protections for the platform and the rights of the copyright holder "depend[] on the function the service provider performed with respect to the infringement at issue." *Id*. at 1067.

On one hand, the statute makes it easier for copyright holders to enforce their rights, providing that if they can "meet[] all the statutory requirements," they can obtain information about infringers from the provider storing the allegedly infringing material directly through a subpoena. *Cox*, 148 F.4th at 1058. This often spares them the need "to file an infringement action" merely to obtain identifying information about the alleged infringer. *Id*. at 1059. On the other hand, service providers—who "maintain websites, deliver network access, or host content on their servers"—receive a corresponding legal protection: Section 512 "limit[s] service providers' liability for their users' infringement in exchange for their cooperation in removing infringing content from the Internet." *Id*. at 1058–59. The statute thus "preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." S. Rep. No. 105-190, at 20 (1998).

Section 512 effectuates this compromise by operation of three interrelated sets of provisions: the "safe harbor" provisions and two "inextricably intertwined" provisions—the notice-and-takedown provisions of

subsection 512(c) and the subpoena provision of subsection 512(h). *Cox*, 148 F.4th at 1058, 1063.

**The Safe Harbors** (17 U.S.C. § 512(a)–(d)). The statute supplies categories of services for which a service provider "shall not be liable" for copyright infringement caused by user activity. *See Cox*, 148 F.4th at 1061–62. Whether a provider qualifies under a safe harbor "depends on the function the service provider performed with respect to the infringement at issue." *Id.* at 1067. Subsection 512(a) provides that "[a] service provider shall not be liable . . . for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). Subsections 512(b) and 512(c) limit liability for service providers that provide "intermediate and temporary storage of material on [the service provider's] system or network" and "storage at the direction of a user of material that resides on [the service provider's] system or network," respectively. *Id.* § 512(b), (c). Similarly, subsection 512(d) limits liability for service providers that "refer[] or link[] users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link." *Id.* § 512(d).

Critically, subsection 512(n), titled "Construction," clarifies that "[s]ubsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section," referring to all of Section 512.

17 U.S.C. § 512(n). In other words, Section 512 distinguishes among service providers based on the function they perform with respect to the allegedly infringing material. It places different obligations on distinct service providers, as distinguished by that function.

**The Notice-and-Takedown Provisions** (17 U.S.C. § 512(c)(3)). Section 512(c) provides a limitation on liability for service providers that store material "at the direction of a user." 17 U.S.C. § 512(c)(1). To maintain safe-harbor protection, a provider must "expeditiously" remove or disable access to material upon receiving a compliant notification (a "Takedown Notice"). *Id.* § 512(c)(1)(C).[1]

The requirements for the content of a Takedown Notice to "be effective" are listed in subsection 512(c)(3)(A). Among other requirements, the notice must provide: "[i]dentification of the copyrighted work claimed to have been infringed," *id.* § 512(c)(3)(A)(ii); "[i]dentification of the material

[1] Although these provisions are produced in full only in subsection 512(c)(3)(A), both subsections 512(b) and 512(d) cross-reference subsection 512(c)(3)(A) in requiring specified service providers to respond to notices. *See* 17 U.S.C. § 512(b)(2)(E), (d)(3). As *Cox* explains, subsection 512(b), 512(c), and 512(d) service providers "must respond" to Takedown Notices. 148 F.4th at 1061 (quotation omitted). Subsection 512(a), for its part, provides a safe harbor "for service providers who 'transmit[ ], rout[e], or provid[e] connections for, material through a system or network controlled or operated by or for the service provider.'" *Cox*, 148 F.4th at 1062. A subsection "512(a) service provider cannot participate in the notice and takedown process, because there is nothing for a § 512(a) service provider to take down." *Id.* Subsection (a) is not at issue, as Gharavi conceded that YouTube "perform[s] § 512(c) storage functions" for the videos at issue. *See* ER-8.

that is claimed to be infringing," *id*. § 512(c)(3)(A)(iii); "information reasonably sufficient to permit the service provider to locate the material," *id*. § 512(c)(3)(A)(iv); and "a statement" that the "use of the material . . . is not authorized," *id*. § 512(c)(3)(A)(v). After receipt of a proper notification, the service provider must "expeditiously remove" the allegedly infringing material. *Id*. § 512(b)(2)(E), (c)(1)(C), (d)(3).

**The Subpoena Provision** (17 U.S.C. § 512(h)). Subsection 512(h) creates the subpoena process that is at the heart of this appeal. Under subsection 512(h)(1), a copyright owner may request that the "clerk of any United States district court" issue a subpoena to a covered service provider to attempt to identify an alleged infringer. The request must include "a copy of a notification described in subsection (c)(3)(A)"—that is, a proper Takedown Notice. *Id*. § 512(h)(2)(A). If the request "satisfies the provisions of subsection (c)(3)(A)," and the request is otherwise in the "proper form," the clerk "shall expeditiously issue and sign the proposed subpoena," *id*. § 512(h)(4), requiring disclosure of "information sufficient to identify the alleged infringer of the material described in the notification to *the extent such information is available to the service provider*," *id*. § 512(h)(3) (emphasis added).

The issuance of the subpoena is a "ministerial function performed quickly." S. Rep. No. 105-190, at 51. No underlying lawsuit is filed, and no judicial officer other than the clerk of the district court is involved. Upon receipt of a subpoena, the service provider "shall expeditiously dis-

close to the copyright owner or person authorized by the copyright owner the information required by the subpoena." 17 U.S.C. § 512(h)(5). The "issuance, service, and enforcement" of the subpoena is governed by "the Federal Rules of Civil Procedure." *Id.* § 512(h)(6).

## II. Factual Background.

**The Services at Issue.** Google offers more than seventy distinct products and services—including (among many others) YouTube, a video-hosting platform, and AdSense, an advertising and monetization service. ER-9–10 & n.1. These services perform fundamentally different functions.

YouTube is "an online service for sharing and watching videos and related content." *Ray v. Google LLC*, No. 23-cv-4222, 2023 WL 7305048, at *1 (N.D. Cal. Nov. 6, 2023). Users upload content to the YouTube platform, which then stores and displays that content. *See* ER-9. YouTube does not verify the names and addresses users provide when signing up for the service, and users may not provide information that accurately identifies them if they want to post content anonymously or for other reasons. Accordingly, verified name and address information is often not available to YouTube. ER-10.

AdSense is a distinct Google service that does not store YouTube videos, or indeed any user content. ER-10. Instead, it is an advertising-monetization service through which website publishers earn revenue by displaying advertisements. ER-9–10. AdSense account holders can use

the service to generate revenue from any website—not just YouTube, and not just services offered by Google. *Id*. Users form separate relationships with YouTube and AdSense through separate Terms of Service and Policies, and maintain separate accounts. ER-10. Users submit different information when registering for AdSense versus YouTube. *Id*. And users may have a YouTube account without an AdSense account, or vice versa. *Id*. And as Gharavi has recognized, *see* ECF No. 3-1 at 30, even among YouTube users seeking to monetize their content, many do not have their own AdSense account, but instead rely on the AdSense account of a third-party Multi-Channel Network ("MCN"), which has its own AdSense account, *see* ECF No. 17 at 2 n.2. So it would be incorrect to even say that the information connected to any AdSense account definitively will share any identifying information about any specified YouTube account holder.

**The Takedown Notices and Subpoena.** Gharavi claims that YouTube users posted content on YouTube that violated his copyrights. ER-21. He sent multiple Takedown Notices regarding the alleged infringement, ER-21, ER-16–18, and YouTube "removed the material," ER-9.

Gharavi then sought a subsection 512(h) subpoena from the Northern District of California, which the clerk of that court issued in June of 2025. ER-15. Based on Gharavi's identification of "Google LLC" as the recipient of the subpoena, the clerk issued the subpoena to Google. ER-15–16. The subpoena sought identification information for eight YouTube

accounts, including "name, last known address, last known telephone number," and email addresses "associated with each account." ER-16–18. Google then produced the responsive identifying information held by YouTube for all eight accounts, ECF No. 3-1 at 33. After Gharavi requested more identifying information, *id.* at 32–33, Google then made a supplemental production nine days later, *id.* at 31, which Gharavi described as "address[ing] virtually all of the outstanding requirements from the previous correspondence," *id.* at 30.[2]

Gharavi continued to demand more from Google, however, insisting that the "one final piece of information needed to fully satisfy the subpoena requirements" was the information related to the "AdSense" account data for one account ("@WiscoWrestler"). ECF No. 3-1 at 30. Google had already produced three files of "BasicSubscriberInfo" regarding this account. *Id.* at 49, 55. But according to Gharavi, because @WiscoWrestler "has over 11,000 subscribers, it likely participates in YouTube's monetization program through Google AdSense." *Id.* Based on this speculation, he demanded the "AdSense ID(s) linked" to that YouTube account, the "[p]hysical mailing address(es) linked to the AdSense account," and other

[2] The district court struck Gharavi's lengthy motion to compel, ECF No. 3, as inconsistent with its standing orders requiring short letter briefs for discovery disputes, *see* ECF No. 35. The parties' history of good-faith negotiation over the scope of the subpoena—submitted by Gharavi below as attachments to that motion to compel—remains relevant as "undisputed . . . general background" of the proceedings below. *See* 9th Cir. R. 28-2.8.

information about the AdSense account. *Id*. Google declined to expand its production, informing Gharavi that his request for AdSense data went "beyond the allowable scope of 512(h) subpoenas." *Id*.; *see also* ECF No. 3-1 at 28.

Despite Google's production of identifying information regarding all eight accounts at issue (including the @WiscoWrestler account), *see* ECF No. 3-1 at 18–25, Google and Gharavi were unable to resolve their disagreement about the scope of subsection 512(h), *id*. at 18. Gharavi filed a motion to compel the production of the AdSense data, claiming that because "Google LLC" is "YouTube's parent company," it must search *all* of its systems for any responsive information about the allegedly infringing YouTube accounts. ECF No. 3 at 9, 17–18. After the district court struck Gharavi's motion to compel as inconsistent with its standing orders regarding discovery disputes, ECF No. 35, the parties filed a joint letter brief, ER-6–11.

**The District Court's Order**. Applying this Court's *Cox* decision and Section 512's function-specific approach, the district court agreed with Google and denied Gharavi's request. ER-3–5. Observing that "while Gharavi may be permitted to seek information about AdSense," the court found that he "may not do so through a 512(h) subpoena" for three principal reasons. *First*, "AdSense is a distinct entity from YouTube," such that users "form a separate relationship" with each, governed by different "Terms and Policies." ER-4 (quotations omitted)

("[I]ndividuals may use YouTube without AdSense, and vice versa."). *Second*, AdSense "does not appear to perform any storage function" with respect to the allegedly infringing YouTube videos at issue. ER-4–5 (citing *Cox*, 148 F.4th at 1067). *Third*, because "the types of subpoenas that may be issued prior to the filing of a complaint are quite limited," a "Section 512(h) subpoena is the wrong vehicle" to reach AdSense data. ER-5. Rather, the court observed that Gharavi could file a lawsuit and then seek appropriate third-party discovery under Federal Rule of Civil Procedure 45. *Id*.

## STANDARD OF REVIEW

The interpretation of Section 512 is a question of law reviewed *de novo*. *Cox*, 148 F.4th at 1061. The district court's factual conclusions—for example, its discussion of how users interact with YouTube and AdSense, and the distinct "function[s]" performed by each service, *see* ER-4—are reviewed for "clear error," *Cox*, 148 F.4th at 1061.

## SUMMARY OF ARGUMENT

**I**. The district court correctly held that Gharavi's subsection 512(h) subpoena was limited in scope to information available to YouTube, the only service that stored the allegedly infringing content. The subpoena did not require Google to search the networks and systems spread across its entire corporate enterprise for information from unrelated services like AdSense. This Court's decision in *Cox*, which joined the D.C. Circuit in *Verizon* and the Eighth Circuit in *Charter*, confirms that the scope of a subsection 512(h) subpoena "depends on the function the service provider performed with respect to the infringement at issue." 148 F.4th at 1067. Only the service that "stored the infringing material at issue" falls within that scope, even if other services offered by the same corporate parent perform *other* functions. *Id*. at 1069 n.6. Because AdSense does not store, display, or have any ability to remove or disable access to YouTube videos, it cannot receive a Takedown Notice for that content. Because it cannot receive a Takedown Notice, it cannot receive a subsection 512(h) subpoena.

**A**. Section 512's text and structure compel the function-specific interpretation adopted in *Cox*. The statute's safe harbors in subsections 512(a) through (d) distinguish among service providers based on whether they transmit, cache, store, or link to allegedly infringing material. The notice-and-takedown provisions of subsection 512(c)(3)(A)(iii) require a copyright holder to identify material "to be removed or access to which is

to be disabled," a provision that only has force if the recipient actually has the ability to remove that material. And subsection 512(h) repeatedly cross-references subsection 512(c)(3)(A), requiring a compliant Takedown Notice as a prerequisite to a subsection 512(h) subpoena. This "inextricably intertwined" structure confirms that a service provider's subpoena-response obligations can only be understood by reference to the storage function it performs with respect to *specific* allegedly infringing content. *Cox*, 148 F.4th at 1063; *see id.* at 1069 n.6.

**B**. Section 512's purpose and history reinforce this function-specific interpretation, confirming that Congress designed subsection 512(h) as a narrow exception to ordinary discovery rules, strictly limited to services engaged in storing allegedly infringing material. Its departure from ordinary litigation procedures—permitting court clerks to issue subpoenas based solely on *ex parte* affirmations in the absence of a lawsuit—was acceptable to Congress only because it understood that the scope of subsection 512(h) subpoenas would be constrained. The legislative history confirms that Congress expected that subpoenas would require disclosure of information "in the possession of the service provider, rather than obliging the service provider to conduct searches for information that is available from other systems or networks." S. Rep. No. 105-190, at 51; H.R. Rep. No. 105-551 (II), at 60–61 (1998) (same). This distinction between a service provider's own systems and "other systems or networks" that exist (but need not be searched) makes sense only if corporate

entities can be understood to offer distinct services with respect to different content.

**II**. Gharavi's arguments to the contrary are meritless.

**A**. Gharavi's repeated description of Google LLC as the responding "entity" answers the wrong question. Focusing on the corporation that receives the subpoena ignores Section 512's text, which refers not to *entities* or *corporations*, but to *service providers* distinguished by the function they play with respect to the allegedly infringing material. Indeed, this Court squarely rejected Gharavi's entity-based theory in *Cox*, for reasons that apply equally in this case. *See Cox*, 148 F.4th at 1069 n.6. The statute's only reference to an "entity" appears in subsection 512(k)'s definition of "service provider." But attempting to draw the bounds of a subsection 512(h) subpoena by reference to that provision is a maneuver that this Court and others have rejected as "border[ing] upon the silly." *Id.* at 1065 (quoting *Verizon*, 351 F.3d at 1236). Accepting Gharavi's entity-based view would functionally erase large swaths of the statute and transform subsection 512(h)'s narrow, ministerial subpoena process into a vast pre-complaint discovery device.

**B**. Gharavi's attempt to distinguish *Cox*, *Verizon*, and *Charter* as addressing only "threshold" questions fails. Those cases all mandate a function-specific analysis of Section 512 as a whole (confirmed by the plain text of subsection 512(n)), *especially* with respect to the scope of subpoena-response obligations. *Cox's* extensive reasoning about how *all*

of Section 512 holds together—especially its holding that the relevant question is "the function performed with respect to the alleged infringement at issue," 148 F.4th at 1067—is binding law of the Circuit. There is no possible way to read *Cox* as leaving room for Gharavi's entity-based theory.

**C**. Gharavi's complaint that the district court's ruling leaves him without recourse is unfounded. As the district court correctly observed, Gharavi may file a lawsuit and seek broader discovery under the Rules of Civil Procedure. Courts routinely permit Doe complaints followed by discovery to identify anonymous defendants, and Gharavi cites no cases suggesting that he could not seek that same relief here provided he could make a minimal showing of jurisdiction and a colorable claim. That is the vehicle by which Google ordinarily discloses AdSense data. The requirement that Gharavi file a complaint before obtaining broader discovery ensures that his claims receive at least minimal judicial oversight—a safeguard absent from subsection 512(h)'s ministerial process.

**III**. Even if the statutory-interpretation question were a close call, additional fundamental considerations strongly counsel in favor of the district court's narrow reading of subsection 512(h). Gharavi's entity-based interpretation would compel disclosure of presumptively private user data relating to a broad swath of online expression and conduct across Google's entire corporate enterprise, with minimal judicial supervision, and without any specific demonstrated need for the private data

of others. This implicates Google's users' First Amendment rights to use the internet to speak anonymously in the "modern public square" of the internet, *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017), continuing an "honorable tradition of advocacy and dissent" that courts have long protected, *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). Gharavi's approach would allow alleged infringement in a single YouTube video to serve as a vehicle to unmask anonymous users across Google's suite of services, even when no infringement is occurring on those platforms. It would also undermine Google's strong interest in protecting user data against unwarranted disclosure—an interest that is not only a core value of the business but is also essential to maintaining user trust in online platforms. Gharavi's expansive view of Google's disclosure obligations takes no account of these weighty considerations.

## ARGUMENT

The district court correctly identified this case as a "simple dispute." ECF No. 35 at 13. This Court and others have held that a subsection 512(h) subpoena requires only a service provider who performs a storage function with respect to allegedly copyright-infringing material to disclose responsive information. *Cox*, 148 F.4th at 1061; *see Verizon*, 351 F.3d at 1237 (holding that subsection 512(h) subpoenas are "structurally linked to the storage functions" of the provider). The district court properly understood that precedent to mean that, because AdSense "does not appear to perform any storage function" with respect to allegedly infringing YouTube videos, Gharavi's subpoena was limited as a matter of law to YouTube. ER-4–5. Because only YouTube "stored the infringing material at issue," only information available to YouTube is responsive under subsection 512(h). *Cox*, 148 F.4th at 1069 n.6.

Gharavi's bold position that the legal "entity" receiving a subpoena must always search its entire set of networks and systems for responsive information drives a truck through the limited procedural path created by subsection 512(h). Section 512 does not refer to *entities*; it refers to *service providers*, understood by the storage function that they perform. *See Cox*, 148 F.4th at 1061. The statute's limited scope is no accident, as Section 512 departs from ordinary rules of civil litigation in not requiring an underlying "infringement action" before a subpoena may issue. *Cox*, 148 F.4th at 1059. It instead requires only a court *clerk* to perform the

"ministerial" task of approving subpoena requests. *See* S. Rep. No. 105-190, at 51. The district court thus correctly concluded that, even if Gharavi could obtain the information he seeks upon filing a lawsuit, he cannot get the same result through subsection 512(h)'s exceptional and narrow procedure for pre-complaint discovery. Gharavi's claim that subsection 512(h) fails to provide him a "sufficient remedy" is "ultimately a question for Congress, not the courts." *Cox*, 148 F.4th at 1067.

## I. A Subsection 512(h) Subpoena for Information Related to YouTube Videos and Accounts Does Not Require Google to Search Other Networks or Systems Owned or Operated by Google.

Multiple courts of appeals, including this Court, have held that subsection 512(h) limits the scope of a subpoena not based on the "status" of a service provider or its broader business, but on the "function performed with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067; *see Verizon*, 351 F.3d at 1237, *Charter*, 393 F.3d at 777. In other words, it is "incorrect" to simply ask whether a subpoena-respondent "is" a specified service provider under the DMCA. *Cox*, 148 F.4th at 1067. Instead, a subpoena may reach only as far as the information available to the service provider *storing* the allegedly infringing material. *Id*. The statute makes no mention of a broader corporate entity and does not require a search of a corporate entity's systems that play no role in storing the allegedly infringing content.

As applied here, the statute's functional limitations and this Court's precedent confirm that the district court was correct to limit the subsection 512(h) subpoena to information available to YouTube about the accounts on which allegedly infringing material appeared. YouTube is the relevant "service" that performs the function of storing, displaying, and removing the content subject to Gharavi's request. That Google also offers AdSense, a distinct service that does not perform the function of storing the allegedly infringing YouTube content (or any user content), does not transform Section 512's limited, pre-complaint subpoena power into a vast discovery tool that requires disclosure of information related to all of Google's various products and services.

### A. A subsection 512(h) subpoena can demand information only from the service provider that stored allegedly infringing content and that received a Takedown Notice for that material.

*Cox* fits in a uniform line of precedent that limits the scope of a subsection 512(h) subpoena to the storage functions that can support a Takedown Notice. *See Cox*, 148 F.4th at 1067; *Verizon*, 351 F.3d at 1236–37 (subsection 512(h) extends to a service provider "engaged in storing copyrighted material"); *Charter*, 393 F.3d at 777 (agreeing with *Verizon* that "§ 512(h) is structurally linked to the storage functions of an ISP"). In each of these cases, the court held that an internet service provider was not the proper recipient of a Takedown Notice because it did not store the allegedly infringing material. Because "the § 512(h) subpoena provi-

sion is inextricably intertwined" with the Takedown Notice provisions, this lack of a storage function in each case meant that the service provider therefore could not be issued a subpoena with respect to the same material, either. *Cox*, 148 F.4th at 1063. That conclusion follows directly "from both the terms of § 512(h) and the overall structure of § 512." *Verizon*, 351 F.3d at 1233. Here, because AdSense similarly does not store any material relevant to Gharavi's allegedly infringed YouTube content, *see* ER-4, the same reasoning requires affirmance.

### 1. Section 512's text and structure permit subpoenas only to service providers who store allegedly infringing content.

The function-specific interpretation that this Court and others have adopted is compelled by "the text of the statute." *Verizon*, 351 F.3d at 1234. To begin, the identification of the service providers that Section 512 "exempt[s] from liability" under the statute's safe harbor provisions depends on the "different functions" that a service provider may perform. *Cox*, 148 F.4th at 1061. As this Court has explained, "[s]ubsections 512(b) and 512(c) limit liability for service providers who provide 'intermediate and temporary storage of material on [the service provider's] system or network' and 'storage at the direction of a user of material that resides on [the service provider's] system or network.'" *Id*. at 1061–62. "Similarly, § 512(d) limits liability for service providers who 'refer[] or link[] users to an online location containing infringing material or infringing activity.'"

*Id.* at 1062.[3] Once a service provider qualifies for one of these provisions based on its function with respect to the alleged infringement, the safe harbor itself—that is, the exemption from liability—similarly speaks in functional terms, stating that the provider "shall not be liable . . . for infringement of copyright *by reason of* the provider's" transmission or storage of the material. *Cox*, 148 F.4th at 1067 (observing that subsections (a) through (d) all "contain similar language"). Taken together, these provisions mean that a provider's qualification for a safe harbor "depends on the function the service provider performed with respect to the infringement at issue." *Id.* at 1067.

The statute's notice-and-takedown provisions are linked to those functional safe-harbor categories. *See supra* pp. 5–9. As the Court has explained, service providers qualifying under subsections 512(b) through (d) are obligated to "respond[] expeditiously to remove, or disable access to, the material that is claimed to be infringing," *Cox*, 148 F.4th at 1061 (quoting 17 U.S.C. § 512(b)(2)(E), (c)(1)(C), (d)(3)), if they receive a Takedown Notice that complies with the provisions of subsection 512(c)(3)(A), *see id.* at 1062; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 & n.2 (9th Cir. 2007) (explaining six requirements for an

---

[3] As discussed above, *see supra* p. 7 n.1, a subsection "512(a) service provider cannot participate in the notice and takedown process, because there is nothing for a § 512(a) service provider to take down." *Cox*, 148 F.4th at 1062. No one here asserts that YouTube is a subsection 512(a) provider.

"effective" takedown notice, and holding that the statute requires "substantial compliance with *all* of § 512(c)(3)'s clauses"). Relevant here, the Takedown Notice must provide "'[i]dentification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.'" *Cox*, 148 F.4th at 1062 (quoting 17 U.S.C. § 512(c)(3)(A)(iii)).

The statute then "inextricably intertwine[s]" the function-based safe harbors and the contents of the Takedown Notice with the requirements for a subsection 512(h) subpoena. *Cox*, 148 F.4th at 1063. As *Cox* explains, subsection 512(h) repeatedly "cross-reference[s]" subsection (c)(3)(A) in setting out the requirements for a subpoena. *Cox*, 148 F.4th at 1063. Among other requirements, the subpoena request must contain "a copy of a notification described in subsection (c)(3)(A)," and the clerk must issue the subpoena only if "the notification filed satisfies the provisions of subsection (c)(3)(A)." 17 U.S.C. § 512(h)(2), (h)(4). If the subpoena request is procedurally proper, the court clerk "shall" direct the recipient to provide "information sufficient to identify the alleged infringer of the material described *in the notification*." *Id.* § 512(h)(3) (emphasis added). Thus, "without an effective (c)(3)(A) notification, a copyright holder cannot obtain a valid § 512(h) subpoena." *Cox*, 148 F.4th at 1067.

Subsection 512(n), which bears the header, "Construction," confirms that the statute must be interpreted with an eye toward the specific

function of the service provider receiving the Takedown Notice or a subpoena. This provision states that "[s]ubsections (a), (b), (c), and (d) describe separate and distinct functions"—not just for the purpose of identifying the relevant safe harbor, but "for purposes of applying *this section*" (emphasis added). That, of course, includes subsection 512(h). The provision thus confirms that a service provider's obligations under the statute can only be understood by assessing the role the subpoena-respondent played "with respect to the infringement at issue." *Cox*, 148 F.4th at 1067–68. A corporate entity can be the home of many different services, but each service must be analyzed separately under Section 512. *See id*. at 1069 n.6.

Simply stated, as *Cox* and other precedent confirm, there is no way to understand the proper scope of a subsection 512(h) subpoena without first understanding the scope of a Takedown Notice issued under subsection 512(c)(3)(A). A Takedown Notice is valid only if sent to a service provider who qualifies for the safe harbor of subsections 512(b) through (d) because it "store[s]" or provides access to "infringing material." *Cox*, 148 F.4th at 1062. A provider who "cannot 'remove' or 'disable access to' any infringing content [its] subscribers might share" cannot receive a Takedown Notice. *Id*. And a provider who cannot receive a Takedown Notice cannot receive a subsection 512(h) subpoena, because that provision is "structurally linked" to the contents of a proper Takedown Notice. *Verizon*, 351 F.3d at 1237; *Charter*, 393 F.3d at 777 (same). The dispositive

question in assessing the scope of a subsection 512(h) subpoena, then, is "the function performed with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067. Only a service provider who "stored the infringing material at issue" has obligations to respond to a subpoena under subsection 512(h), *id*., and only by disclosing the information *available to it*, *even if* that service's corporate parents may offer other services performing other storage functions. *Id*. at 1069 n.6.

**2. The district court properly limited the scope of Gharavi's subsection 512(h) subpoena to YouTube, the only service that stored or provided access to the allegedly infringing content.**

Applying the statute's function-focused approach, the district court concluded that Gharavi's subpoena could demand responsive information from YouTube, but not other Google services like AdSense that did not "perform [a] storage function" with respect to the allegedly infringing YouTube content. ER-4–5. Because YouTube and AdSense are "distinct" services that perform different functions, the district court properly limited Gharavi's subsection 512(h) subpoena to the service that stored the YouTube videos at issue: YouTube. *Id*. The district court's factual conclusions about the functions performed by Google's distinct services were correct—and certainly not "clear error." *See Cox*, 148 F.4th at 1061.

The district court did not clearly err in identifying YouTube—and not AdSense or any other Google service—as the "service provider" that "engaged in storing copyrighted material" subject to Gharavi's assertions

of copyright ownership. *Verizon*, 351 F.3d at 1237; *see* ER-4.[4] Indeed, Gharavi never disputed that this is the case: his own subpoena listed only YouTube accounts, *see* ER-17–18, and he descried to the district court the videos about which he complains as being hosted on "YouTube servers" that "serve YouTube traffic," ER-7; *see also* ER-8 (Gharavi conceding that YouTube "admittedly" is the "provider performing § 512(c) storage functions"). Though he takes a different (incorrect) view of the law that does not accept this Court's mandated function-specific approach to identifying the relevant service provider, *see infra* Part II, Gharavi never disagrees that YouTube "perform[s]" the relevant "storage function." ER-4.

Gharavi thus does not demonstrate any error—let alone a clear error—in the district court's factual findings about the distinct services performed by AdSense and YouTube. ER-4; *see Parsons v. Ryan*, 949 F.3d 443, 469 (9th Cir. 2020) (observing that showing clear error on appeal is a "heavy burden" that requires a demonstration that the district court's findings are "'illogical, implausible, or without support in inferences that may be drawn from the record'") (quoting *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc)). Because it is unrebutted that

---

[4] Although the district court did not identify the specific safe harbor that describes YouTube, Gharavi conceded below that YouTube "admittedly" is the service that "perform[s] § 512(c) storage functions." ER-8. This was correct, because subsection 512(c)'s safe harbor—for service providers that provide "storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider"—describes YouTube perfectly.

*only* YouTube performs a storage function with respect to the allegedly infringing videos, *only* information held by YouTube is responsive to the subpoena. ER-4–5.

AdSense, by contrast, "does not appear to perform any storage function" for *any* user content, let alone the YouTube videos at issue. ER-4. For that reason, AdSense could not receive a Takedown Notice, given that it would have had no ability to "remove[]" or "disable[]" access to those videos. *Cox*, 148 F.4th at 1062 (quoting 17 U.S.C. § 512(c)(3)(A)(iii)). And because AdSense cannot receive a Takedown Notice with respect to that content, it also "cannot" be the subject of a "valid § 512(h) subpoena" with respect to that same content. *Cox*, 148 F.4th at 1067.

Gharavi's repeated suggestion that YouTube, AdSense, and Google rely on "integrated databases" is both unproven in the record and irrelevant under *Cox*. Opening Br. 7; *see also id*. at 15, 20, 24, 29. This argument does not assert that any "integrated" system *stores content*; it argues only that Google stores identifying information about *users* across systems and networks. *E.g.*, Opening Br. 20 (arguing that Google's "integrated databases" store "user account information," not content). So, even if Google did "integrate" all of its systems as Gharavi states, that would not help explain what information is "available to the service provider," properly understood by its function under subsection 512(h). Again, Gharavi conceded that *YouTube* "admittedly" is the service that "perform[s] § 512(c) storage functions" with respect to the content at issue—

and that alone disposes of any relevance to his "integration" argument. ER-8; *see supra* p. 27 & n.4. And in any case, the district court did not accept Gharavi's factual argument about how Google's systems are "integrated"—which he made below, *see* ER-7–9—but instead found that YouTube and AdSense are "distinct," and that AdSense "does not appear to perform *any* storage function," ER-4 (emphasis added). Gharavi has offered nothing to the district court or to this Court suggesting that this finding was a clear error.

To be sure, the district court also suggested that, because it did not store content, AdSense was a "Section 512(a)" service provider. ER-4–5 (citing *Cox*, 148 F.4th at 1067). That statement was not correct because AdSense did not "transmit[], rout[e], or provid[e] connections for" the allegedly infringing YouTube material through its "system or network." *See* 17 U.S.C. § 512(a). Still, the district court's stray observation makes no difference because *AdSense's* classification under Section 512 does not matter to this dispute at all. Indeed, the district court's attempt to classify AdSense under Section 512 was entirely independent from its *relevant* finding: that only YouTube, and not AdSense, "perform[ed]" a "storage function" with respect to the allegedly infringing YouTube content. ER-4. So despite this stray observation about an orthogonal issue, the district court's decision "must be affirmed" because the error was irrelevant and "the result is correct." *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 892 (9th Cir. 2019) (quotation omitted).

### B. Subsection 512(h)'s purpose and history confirm that the district court was correct to limit the subpoena to YouTube, the only service performing a storage function.

Because the text and this Court's precedents are "clear," no further analysis is necessary. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017). But if there were any lingering doubt, Section 512's "purpose and design corroborate" the district court's reading. *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 162 (2018). They confirm that Congress's "objective," *id.*, was to create a narrow procedural path for pre-complaint discovery about online copyright infringement, strictly limited by the functions performed by a service provider. It was not to expose all of the online expression and activity of an alleged infringer and any corporate entity whose various products may store *some* user content to vast discovery of their corporate systems, untethered from an underlying lawsuit. Congress strictly limited the scope of discovery to the alleged infringement itself; *i.e.*, storage and publication of allegedly infringing material.

Subsection 512(h) can only be understood as a rare and limited exception to ordinary discovery rules—the "background principle[s]" against which Congress legislated. *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559, 572 (2021); *see Biden v. Nebraska*, 600 U.S. 477, 511–12 (2023) (Barrett, J., concurring) (explaining how "[b]ackground legal conventions . . . are part of the statute's context"). As the district court observed, the ordinary route for compelling the production of information through a court is to file a lawsuit, and then to conduct discovery under

the supervision of the court with parties and third parties in connection with that litigation. *See* ER-5 ("[T]he types of subpoenas that may be issued prior to the filing of a complaint are quite limited."). Subsection 512(h) is a narrow and unusual exception. It permits a court clerk—not a judge—to issue subpoenas in the absence of a pending case or controversy, based solely on the *ex parte* affirmations of the copyright holder. 17 U.S.C. § 512(h)(4)–(5). No judicial officer reviews the request, or any element of the underlying claim of infringement, before the subpoena's issuance. *Id.* § 512(h)(5). This scheme is so unusual, in fact, that *Charter* expressed "some concern" that this "subpoena mechanism . . . *may* unconstitutionally invade the power of the judiciary." 393 F.3d at 777–78. Like in *Charter*, this Court need "not reach these issues" because the case can be resolved on "more narrow statutory grounds." *Id.* at 778. But this real constitutional concern only confirms that subsection 512(h) represents a significant departure from standard discovery procedure.

Section 512 is best understood, then, as creating a narrow procedural exception to the ordinary rules of litigation, to solve the "unique copyright enforcement problems caused by the widespread use of the Internet." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004) (citing *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003)). The statute "'balance[s] the need for rapid response to potential infringement with" internet users' "legitimate interests in not having ma-

terial removed without recourse.'" *Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004) (quoting S. Rep. No. 105-190, at 21). It protects online speech from intrusive discovery except when directly tied to ongoing infringement. And it preserves service providers' safe harbors by sparing them from the consequences of liability for contributory copyright infringement, if they expeditiously remove or disable access to allegedly infringing material. *See Corbis*, 351 F. Supp. 2d at 1098–99; *see supra* pp. 4–9. Through subsection 512(h), Congress permitted subpoenas to issue without judicial oversight precisely *because* the scope of those subpoenas was tightly constrained by the function performed by a specific provider "with respect to the infringement at issue." *Cox*, 148 F.4th at 1067. Allowing these exceptional subpoenas to reach beyond that limited scope would transform this narrow, ministerial tool into a broad discovery device, without many of the ordinary procedural safeguards of litigation-based discovery.

Section 512's legislative history confirms that Congress had this narrow, function-specific design in mind. *See Verizon*, 351 F.3d at 1238 (noting absence of legislative history supporting plaintiff's position). The relevant House and Senate reports contain identical language explaining that "Section 512's limitations on liability are based on functions, and each limitation is intended to describe a separate and distinct function" with respect to allegedly infringing material. *See* S. Rep. No. 105-190, at 55; H.R. Rep. No. 105-551 (II), at 65. Both houses' relevant committee

reports also contain identical language explaining the intended scope of the subpoena provision—then designated subsection (g)—as limited in scope to the specific "systems or networks" that stored the allegedly infringing material:

> Orders issued under subsection (g) shall authorize and order the service provider expeditiously to disclose to the person seeking the order information sufficient to identify the alleged infringer to the extent such information is available to the service provider. The Committee intends that an order for disclosure be interpreted as requiring disclosure of *information in the possession of the service provider, rather than obliging the service provider to conduct searches for information that is available from other systems or networks*.

S. Rep. No. 105-190, at 51; H.R. Rep. No. 105-551 (II), at 60–61 (emphasis added).[5] The Committees further explained that "[t]he issuing of the order should be a ministerial function performed quickly for this provision to have its intended effect." *Id*. These provisions directly support the district court's conclusion, and refute Gharavi's challenge, because they expressly distinguish between "information in the possession of the service provider" and information on the "other systems or networks" that a subpoena-respondent might theoretically be able to search. *Id*. The distinction between "systems or networks" that exist—but need not be searched—would make no sense if Congress intended receiving corporate

[5] Before the Committees, the draft bill referred to an "order" from a district court clerk rather than a "subpoena," but the provision was otherwise materially identical. *See* S. Rep. No. 105-190, at 51.

*entities* to conduct broad searches of every service provider under their broad corporate umbrellas in response to a subsection 512(h) subpoena. It instead confirms that a corporate entity may operate many "systems or networks," but that it need *not* search the ones that did not perform a storage function with respect to the allegedly infringing content.

This therefore "happens to be a case in which the legislative history" makes it "pellucidly clear" that Congress intended to distinguish between the systems and networks that store allegedly infringing content, and those that do not. *Zuni Pub. Sch. Dist. No. 89 v. Department of Educ.*, 550 U.S. 81, 106 (2007) (Stevens, J., concurring). And the mechanism that Congress intended—and then enacted—was to distinguish those systems according to the specific function that each service performed with respect to allegedly infringing user content. The district court correctly honored that design in limiting the scope of Gharavi's subpoena to YouTube.

## II. Gharavi's Arguments Lack Merit.

Gharavi does not attempt to satisfy the function-based analysis that the text, this Court's precedent, and the statutory context and history all require. He instead argues that Google LLC as a whole is the "entity" responsible for responding to subsection 512(h) subpoenas with information drawn from every one of its products or systems—no matter which of the many Google services is involved, or which function (if any) each service performed with respect to the allegedly infringing content.

*See* Opening Br. 14–15. But to accept that entity-based interpretation would defy precedent, thwart Congress's design, and require service providers that do not store or transmit copyrighted material *at all* (like AdSense) to conduct searches in response to pre-complaint discovery requests. Here, that would mean that a single instance of alleged infringement on YouTube could expose to pre-complaint discovery the identity of users of other Google products and services that have nothing to do with the alleged infringement. That could include, for example, Google Search, posts on Blogger, or email messaging on Gmail. And that could lead to chaos as applied to AdSense because (as discussed above) the fact that multiple users often use third-party aggregation services to monetize their accounts means that a single AdSense account is often not reliably connected to any one YouTube account—exposing perhaps large numbers of users to unnecessary data disclosure and leaving Google guessing about how to supply responsive identifying information. *See supra* p. 10.

Gharavi's rule is not only wrong; it is also unnecessary. As the district court correctly concluded, Gharavi has an available vehicle for his broader request: he can file a lawsuit and seek ordinary discovery. ER-5; *see Charter*, 393 F.3d at 775 n.3 (observing that copyright holders "can also employ alternative avenues to seek this information"). While Gharavi may not be able to obtain every shred of information he desires through subsection 512(h), it "is not the province of the courts" to "rewrite

the DMCA," and Gharavi's policy complaint "must be addressed in the first instance by the Congress." *Verizon*, 351 F.3d at 1238.

### A. Section 512 provides no support for Gharavi's staggeringly broad entity-based theory because the statute defines obligations of "service providers," not "entities."

Gharavi repeatedly suggests that Google LLC must respond with information available from all of its various products and business units because Google LLC is the "entity" that received the subpoena and appeared in litigation. *E.g.*, Opening Br. 14–26, 31–33. He takes that to mean that because subsection 512(h) response obligations run to the "service provider receiving . . . the subpoena," then *all* of Google must be the relevant "service provider" with response obligations. Opening Br. 17 (citing 17 U.S.C. § 512(h)(3)).

But subsection 512(h) does not depend on the entity receiving a subpoena; it depends on the "function performed with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067. Gharavi's repeated use of the word "entity" without attribution ignores the statute's function-focused design and this Court's unambiguous precedent about the proper scope of a subsection 512(h) subpoena. Indeed, *Cox* squarely rejected Gharavi's entity-based theory when it held that *despite* the fact that other Cox services may "store content," what matters is identifying the precise service *within* Cox's broader corporate umbrella that "stored the infringing material at issue." *Id*. at 1069 n.6. Only that specific service perform-

ing that specific function falls within subsection 512(h)'s reach, even if it is part of a larger corporate enterprise that contains *other* services storing content in other ways. *Id.*

Even aside from *Cox's* square rejection of his entity-based arguments, Gharavi also finds no textual support in Section 512. The only place the statute refers to an "entity" is in subsection 512(k), which defines the term "service provider" as an "entity" that transmits, routes, or provides connection for user "material," 17 U.S.C. § 512(k)(1)(A), or is a "provider of online services or network access, or the operator of facilities therefor," *id.* § 512(k)(1)(B). Gharavi takes these definitions to mean that the "whole" of Section 512 refers to the "entity" that received the subpoena. Opening Br. 15. Because that "entity" is Google LLC, he claims that Google's entire corporate enterprise "qualifies under § 512(k)(1)(B)," and that this defines the scope of Google's response obligations under subsection 512(h). *Id.* But everywhere else, as Gharavi recognizes (*see* Opening Br. 17), the statute refers not to the entity but to the "service provider." 17 U.S.C. § 512(h)(3). And, in subsection 512(n), the statute confirms that different service providers receive different treatment depending on their "separate and distinct functions" with respect to allegedly infringing content.

This Court and the D.C. Circuit have both rejected materially identical articulations of Gharavi's argument as "'border[ing] upon the silly'" because this view ignores "the main conflict" in assessing the scope of a

subsection 512(h) subpoena. *Cox*, 148 F.4th at 1065 (quoting *Verizon*, 351 F.3d at 1236). That is because it does not even grapple with the statute's safe harbors or the "notification requirement" of subsection 512(c)(3)(A), and thus entirely ignores Section 512's function-specific structure. *Cox*, 148 F.4th at 1065 (citation modified). Gharavi can "[d]efine all the world as a [service provider] if [he] like[s]," *Verizon*, 351 F.3d at 1236, but doing so would not inform the provider's response obligation under subsection 512(h) "with respect to" the specific "infringement at issue," *Cox*, 148 F.4th at 1067. As discussed above, subsection 512(h) response obligations are "inextricably intertwined" with the other provisions of the statute. *See id*. at 1063. The statute's subpoena obligations cannot be understood in isolation from a Takedown Notice about specific alleged infringement; the proper Takedown Notice cannot be understood in isolation from the safe harbors; and that safe harbor cannot be understood without a function-specific analysis of the storage function performed with respect to allegedly infringing content. *See supra* p. 24. That is why it is "incorrect" to ask whether Google "is" a service provider—that question does not resolve the scope of a subpoena concerning specific alleged infringement. *Cox*, 148 F.4th at 1067. Gharavi ignores all of this.[6]

---

[6] For the same reason, the fact that subsection 512(h)(5) requires disclosure "notwithstanding any other provision of law" is irrelevant. *See* Opening Br. 18. Such "notwithstanding" clauses merely "show[] which provision prevails in the event of a clash" *between* statutory provisions.

Indeed, Gharavi's view would have the absurd consequence of eliminating the distinctions that Congress drew between the different service providers in subsections 512(b) through 512(d): By Gharavi's view, a service provider under subsection 512(k) is a service provider for all purposes under subsection 512(h). This means that if a *single* product or service stores or transmits *any* user content, a corporate entity must respond to all DMCA subpoenas by searching for information sufficient to identify the infringer on every one of its products and services, no matter the storage function performed by each product or service. So if Gharavi is right that his unilateral designation of "Google LLC" as the subpoena-respondent is enough to require all of Google to search all of its networks and systems, then whole swaths of subsections 512(a) through (d) become meaningless—and *Cox* is no longer good law. *See* Opening Br. 15. Congress did not intend that result, S. Rep. No. 105-190, at 51; H.R. Rep. No. 105-551 (II), at 60–61 (subpoena respondents are not required to search

---

*SW Gen.*, 580 U.S. at 301 (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126–27 (2012)). "[T]hey do not otherwise expand or contract the scope" of the statute in the absence of a conflict. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 16 (2020); *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1168–69 (9th Cir. 2007) ("notwithstanding" clauses must be read to "save and not to destroy" the statute, "giv[ing] effect, if possible, to every clause and word" (citation modified)). For Gharavi to be correct about the import of this provision, he would have to show that subsection 512(h) "overrides" the functional approach taken by other provisions of the *same statute*—subsections (a) through (d). Opening Br. 18. He cannot.

"other systems or networks"), and in any event, this Court remains bound by *Cox*, *see Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

Gharavi's view also invites absurd consequences for the statute's provision of safe harbors to service providers: if even a single service operated by a diversified, multidivisional corporate entity qualified for a safe harbor under subsections (a) through (d), the *entire* corporation would be immunized against most copyright claims—merely because those subsections extend protection to the "service provider." For example, by Gharavi's logic, if YouTube complied with a Takedown Notice based on a single video containing copyrighted material, *all* of Google LLC would qualify as the "service provider" that would then be insulated from infringement liability with respect to that content—even if a different service like Google Search, Blogger, Maps, or Gemini also stored or transmitted the same content at a user's direction. Gharavi's entity-based view also means that if even a single service operated by a corporate entity qualified as a subsection 512(a) service provider because it transmitted user content, then the entire corporation could *never* receive *any* takedown notices; if *service provider* means *entity*, and a subsection "512(a) service provider cannot participate in the notice and takedown process" at all, then this has to be the outcome. *Cox*, 148 F.4th at 1062. These results would thwart Congress's goal of striking a "compromise" that "'preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements.'"

*Cox*, 148 F.4th at 1059 (quoting S. Rep. No. 105-190, at 20). Indeed, Gharavi's rule would actively *disincentivize* diversified providers from removing copyrighted content from individual products and services, which would frustrate the statute and Congress's clear intent.

Similarly, Gharavi's claim that the district court's rule invites "statutory evasion" is severely misplaced. Opening Br. 21 (citation modified). He claims, through pure *ipse dixit* embodied in a hypothetical flow chart, that corporate parents of service providers might create new products that artificially distance user data from the service provider storing user information—just to avoid obligations under subsection 512(h). *Id*. at 22. Setting aside that no provider would actually structure its business this way, Section 512 itself guards against such mischief: under subsection 512(i), a provider cannot qualify for any of the statute's safe harbors unless it has "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders . . . who are repeat infringers" and "accommodates and does not interfere with standard technical measures" used to identify or protect copyrighted works. It is hard to imagine how a provider could intentionally structure its entire business around evasion of subsection 512(h) while still complying with those threshold requirements. *See, e.g.*, *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002) (explaining how a service provider can "fail[] to comply with § 512(i)" by "purposely" making its repeat-infringer policy unenforceable).

More fundamentally, there is no evidence that *any* corporation, let alone Google, has structured its business around evading subsection 512(h) obligations in the way Gharavi suggests, or even that any service provider would have incentive to do so. Indeed, one of the DMCA's principal features is its *protection* of service providers who comply with requests to remove user content. *See Cox*, 148 F.4th at 1059. That explains why internet service providers and other tech industry leaders were among the DMCA's champions during its consideration in Congress, testifying that the bill appropriately balanced enforcement of copyrights against unwarranted liability for service providers, and urging its passage. Google has no reason to restructure its entire business just to avoid compliance with a scheme that industry actively supported.[7] And, of

[7] For example, the president of the Digital Media Association called the statute "a positive step for development of the Internet" and urged its passage. Testimony of Seth Greenstein Before the Subcomm. on Telecomms., Trade & Consumer Prot., H. Comm. on Commerce, 1998 WL 300261 (June 5, 1998). The General Counsel of America Online, on behalf of a coalition of telecommunications companies and online service providers, stated, "[w]e support the balance struck by [the statute] and believe its enactment is of great importance to users, service providers and content providers." Testimony of George Vradenburg, III Before the Subcomm. on Telecomms., Trade & Consumer Prot., H. Comm. on Commerce, 1998 WL 315155 (June 5, 1998). And the president of the Computer & Communications Industry Association warned that without these protections "the growth and development of the Internet will be jeopardized by legal uncertainty and burdensome litigation." Testimony of Edward J. Black Before the Subcomm. on Courts & Intellectual Prop., H. Comm. on the Judiciary, 1997 WL 575023 (Sept. 17, 1997).

course, Congress—not the courts—would be best positioned to respond to Gharavi's policy objections even if they had merit. *See Cox*, 148 F.4th at 1067.

### B. Neither *Cox* nor other relevant precedent can be artificially confined to mere "threshold" questions.

Although Gharavi agrees that "*Cox* is the controlling authority closest to this appeal," he attempts to avoid *Cox*, *Verizon*, and *Charter* by claiming that the cases reach only a "threshold" question not at issue here. Opening Br. 26–28. Characterizing those decisions as addressing only whether a subpoena may issue to a subsection 512(a) service provider who does not store any user content, Gharavi claims that because Google *does* store at least some user content, this precedent is inapplicable in its entirety. That is wrong for two reasons.

First, *Cox's* extensive reasoning in a published opinion mandating a function-specific interpretation of *all* of Section 512—including its subpoena provisions—is binding "law of the circuit." *See United States v. Johnson*, 256 F.3d 895, 914 (9th Cir. 2001) (en banc) (plurality op.) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense."); *see also Miranda B. v. Kitzhaber*, 328 F.3d 1181, 1186 (9th Cir. 2003) (same). While it is true that *Cox* formally holds that a subsection 512(a) service provider—who

cannot remove or disable access to user content—cannot receive a subsection 512(h) subpoena, its reasoning applies more broadly. As discussed above, *Cox* explains that the *entirety* of subsection 512(h) can be understood only by reference to a Takedown Notice under subsection 512(c)(3)(A) and the function-specific safe harbor provisions of subsections 512(a) through (d). *Cox*, 148 F.4th at 1063; *see also supra* pp. 22–26. *Cox* explains that those provisions are "inextricably intertwined" not just as to subsection 512(a), but in general. 148 F.4th at 1061–63. That "reasoning" is "central" to *Cox* and thus is "binding" on later panels. *Garcia v. Holder*, 621 F.3d 906, 911 (9th Cir. 2010) (citation modified).

There is no way to read *Cox* that leaves room for Gharavi's entity-based theory. If Gharavi were correct, then *Cox* would have had no occasion to assess "the function the service provider performed with respect to the infringement at issue." *Cox*, 148 F.4th at 1067. Instead, *Cox* would simply have asked whether the *entity* receiving the subpoena had *any* business units or products that performed *any* storage function with respect to *any* relevant content. By Gharavi's "entity-level construction," that would have been enough to subject the entire receiving entity to subpoena-response obligations under subsection 512(h). *See* Opening Br. 23. Quite the contrary, *Cox* specifically rejected the plaintiff's argument to that effect. *See* 148 F.4th at 1069 n.6 (explaining that subsection 512(a) does not evaluate the subpoena respondent's business "in all respects—only with respect to its role in the alleged infringement"). In focusing on

the storage function of a service provider with respect to specific allegedly infringing content, *Cox* thus squarely rejects Gharavi's approach.

Second, and relatedly, Gharavi's explanation for distinguishing *Cox*, *Verizon*, and *Charter* is just another attempt to define the relevant "service provider" in a way that "borders upon the silly." *Cox*, 148 F.4th at 1065 (citation modified). To Gharavi, all that matters is that "Google LLC received the . . . subpoena," and the question of how much of Google's "own records" it had to search is a question that *Cox* did not answer. Opening Br. 28. But this argument just re-treads Gharavi's claim that a "service provider" with subpoena-response obligations is defined as a corporate *entity* under subsection 512(k), without regard to the delineations in subsections 512(a) through (d) among storage "function[s] . . . performed with respect to the infringement at issue." *Cox*, 148 F.4th at 1067. As discussed above, *supra* pp. 37–40, that argument is wrong because it writes subsections 512(a) through 512(d) out of the statute altogether—blowing up the function-specific safe-harbor provisions and rendering much of Section 512 nonsensical. To Gharavi, the statute's safe harbors, notice-and-takedown provisions, and subpoena provisions are not "intertwined" at all. *Cox*, 148 F.4th at 1063. But *Cox* directly refutes that necessary premise of his argument. *Id*.

### C. Rule 45 discovery remains available and commonly used in similar situations.

Although Section 512 does not support the broad discovery that Gharavi requests, the district court correctly observed that there "may be other ways to acquire this information," including by filing a complaint and issuing a subpoena under Federal Rule of Civil Procedure 45. ER-5. Gharavi's response that this alternative is "illusory," Opening Br. 40, is unpersuasive and unsupported. As Google noted below and Gharavi does not contest, Google "has disclosed AdSense billing profiles" in response to proper Rule 45 subpoenas in other litigation. ER-10 n.2. Nothing in the record suggests that Gharavi could not attempt to follow that procedural path here.

Gharavi's argument that the district court created a "circularity" by which he could never obtain a copyright infringer's identity is belied by his own cited cases. In those cases and others, courts have permitted plaintiffs to file "Doe" complaints and then seek discovery about the unknown defendants. *See* Opening Br. 41–42; *see also Charter*, 393 F.3d at 775 n.3 (observing that "many" "John Doe" lawsuits are filed to identify "otherwise anonymous" copyright-infringement defendants). As Gharavi himself recognizes, this Court has held that "where the identity of alleged defendants will not be known prior to the filing of a complaint . . . the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover

the identities, or that the complaint would be dismissed on other grounds." *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980) (citations omitted). And contrary to Gharavi's suggestion that he could not file a Doe complaint without knowing "who the infringer is and where the infringer is," Opening Br. 41, this Court has held that a district court may *not* dismiss a Doe complaint "simply because" plaintiff was "not aware of Doe's identity at the time he filed his complaint," *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999); *see also Soo Park v. Thompson*, 851 F.3d 910, 928 n.21 (9th Cir. 2017) (holding that plaintiff is "entitled to discovery on the identity of the Does"). A district court in fact "abuses its discretion" in not permitting a plaintiff to amend a complaint to name previously unknown Doe defendants. *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013).

Gharavi's invocation of *Cordova v. 1 Doe* is unavailing. *See* No. 25-cv-5207, 2025 WL 2262999 (N.D. Cal. July 11, 2025). There, the plaintiff filed a lawsuit without first seeking a subsection 512(h) subpoena, and he thus had limited identifying information about the alleged infringer. *Id.* at *2. For that reason, the plaintiff never attempted to demonstrate that the court would have personal jurisdiction over the unknown defendant, instead arguing that the discovery could issue "without any jurisdictional showing at all." *Id.* (citation modified). The court properly found "no merit" in that argument but stayed the action to permit the plaintiff to first seek a subsection 512(h) subpoena and then return to the court

for further discovery. *Id.* That is the sequence that the statute contemplates, and the one that Gharavi is resisting. Indeed, the record here confirms that Google produced "BasicSubscriberInfo" about the @WiscoWrestler account, *see* ECF No. 3-1 at 49, 55, which Gharavi could presumably use as the basis for a Doe complaint here.[8]

The requirement that Gharavi file a complaint before obtaining broader discovery than subsection 512(h) permits is a feature and not a bug of the statutory scheme. Discovery following a Doe complaint would ensure that Gharavi has an articulable claim for copyright infringement that would not "clear[ly]" need to be "dismissed on other grounds," such as an obvious failure to state a claim or a lack of jurisdiction. *Gillespie*, 629 F.2d at 642. While that is not a high bar to clear, those questions simply cannot be evaluated in this pre-complaint posture. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 880 (N.D. Cal. 2020) (a subsection 512(h) subpoena is "its own civil case" where the sole issue is whether the subpoena should be enforced). Requiring an under-

[8] Gharavi's implication that the Doe complaint in *Cordova* hit a dead end is unsupported. The *Cordova* docket does not explain why the action was voluntarily dismissed while the stay was still in effect. *See Cordova*, No. 25-cv-5207 (N.D. Cal. Jan. 6, 2026), ECF No. 8. However, only one day after the district court issued the stay, Cordova filed a new action seeking a subsection 512(h) subpoena from Google. *See In re DMCA Subpoena to Google, LLC d/b/a YouTube*, No. 25-mc-80192 (N.D. Cal. July 12, 2025), ECF No. 1. Unlike Gharavi's subpoena, Cordova's subpoena on its face was limited to Google, "d/b/a YouTube." *See id.* (July 15, 2025), ECF No. 3.

lying lawsuit before discovery can proceed in earnest subjects the case—and its associated discovery requests—to a level of judicial supervision not required by subsection 512(h), which requires a court *clerk* to compel the compliance of a third party before any judicial officer ever reviews the underlying claim. 17 U.S.C. § 512(h)(4). The existence of the Doe complaint and associated Rule 45 discovery as a more procedurally rigorous alternative for broader discovery is thus a perfectly sensible choice for Congress to have made.

By Gharavi's view, subsection 512(h) obviates rather than supplements that ordinary route for obtaining discovery. He in fact goes so far as to argue (without support or citation) that Rule 45 and subsection 512(h) require "identical" productions. *See* Opening Br. 33. Because Google has made "Rule 45 disclosures of AdSense" data in other cases, Gharavi ultimately suggests that this same pre-complaint "vehicle" should entitle him to the same information *as if* he had filed a lawsuit. Opening Br. 47. But the "procedure" by which a litigant seeks judicial relief matters a great deal because the applicable rules impose different "procedural protections" depending on the posture of a case. *Trump v. CASA, Inc.*, 606 U.S. 831, 849–50 (2025); *see Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 330 (1999) (observing that holding parties to proper procedure can advance "fundamental protection[s]," and rejecting an argument that would render procedural rules "a virtual irrelevance"). The Court should reject Gharavi's attempt to

recast subsection 512(h) as a "workaround" or a "shortcut" to the ordinary procedure for obtaining broad third-party discovery. *CASA*, 606 U.S. at 849–50.

Gharavi's claim that Google's "conduct" undermines its position follows from his same error of understanding subsection 512(h) and Rule 45 discovery to require "identical" disclosures. Opening Br. 31–33. Gharavi again cites a case in which Google disclosed AdSense data in response to a Rule 45 subpoena in a copyright-infringement lawsuit—not an independent subsection 512(h) proceeding. Opening Br. 32–33 (citing *Cordova v. Huneault*, No. 25-cv-4685, 2025 WL 2637504, at *3 (N.D. Cal. Sept. 12, 2025)). And Gharavi's suggestion that Google "reversed position" concerning the requests in this case is unsupported: Gharavi admits that Google did not decline to provide AdSense data until "after" Gharavi requested it. Opening Br. 32; *see* ECF No. 3-1 at 30. That is consistent with the record, which demonstrates a good-faith back-and-forth concerning the requests and Google's response, until the parties reached an impasse over the "one final piece of information" that Gharavi demanded: the "@WiscoWrestler" AdSense data. ECF No. 3-1 at 30.[9]

---

[9] Below, Gharavi asserted that Google's objections were untimely by two days. *See* ER-9. The district court did not accept this argument and decided the case on the merits. *See* ER-3–5. And Gharavi has now forfeited that issue on appeal because his Opening Brief does not mention timeliness, let alone "specifically and distinctly" argue any timeliness concerns. *Moran v. Screening Pros, LLC*, 25 F.4th 722, 728 n.6 (9th Cir.

## III. Gharavi's Broad Entity-Based Interpretation Threatens Protected Free Expression and Harms User Trust in Online Platforms.

Although straightforward statutory interpretation is all that is required to decide this case, the district court's faithful application of *Cox* and the statutory text is correct for another reason: Gharavi's requested disclosure sought to compel disclosure of *presumptively private* user data, as governed by various privacy policies. *See, e.g.*, ER-10 n.3 (citing *Ad-Sense Online Terms of Service (United States)*).[10] And as discussed, by proceeding through subsection 512(h), he sought that user-identifying data under extremely minimal judicial supervision and without any specific demonstrated need. So, should the Court find the statutory-interpretation question to be a close call (though it is not), both Google users' First Amendment right to remain anonymous and their strong interest in data privacy strongly counsel in favor of affirming the district court's appropriately narrow view of subsection 512(h).

The compelled disclosure of user data implicates Google's users' First Amendment rights to speak anonymously online. As courts have held in the subsection 512(h) context, "[w]hen adjudicating discovery requests that would unmask an anonymous speaker . . . courts must consider the First Amendment implications of disclosure." *In re DMCA*

---

2022) (collecting cases) (citation modified).

[10] https://adsense.google.com/adsense/terms (last visited Oct. 27, 2026).

*§ 512(h) Subpoena to Twitter, Inc.*, 608 F. Supp. 3d 868, 876 (N.D. Cal. 2022) ("*Twitter*"). And the First Amendment has long valued "[a]nonymity" as "a shield from the tyranny of the majority" and "an honorable tradition of advocacy and of dissent." *McIntyre*, 514 U.S. at 357; *accord In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Google's services enable users to continue that honorable tradition on many fronts: YouTube users can anonymously upload footage voicing controversial perspectives or documenting confrontations with governmental actors; users of Google's blogging site, Blogger, can anonymously publish critical social commentary; users of Gmail can distribute political and personal messages under pseudonymous usernames; and so on. While Section 512 permits limited intrusions into that anonymity for a demonstrated need to protect a copyright, Gharavi seeks identifying information about users that would unmask users across Google's entire suite of services—allowing, for example, alleged infringement on a single YouTube video to serve as a vehicle to reveal the identity of anonymous Blogger or Gmail users, even when there is no infringement occurring on those services. All that matters to Gharavi is that the user-identifying data (although not the allegedly infringing content itself) is allegedly in some sense "integrated" under Google's broader corporate umbrella. Opening Br. 20.

To be clear, Google supports and complies with legitimate legal process, as its relevant privacy policies make clear. *See, e.g.*, ER-10 & n.3.

But—even assuming *arguendo* that the statute is ambiguous—these fundamental First Amendment concerns favor a construction of subsection 512(h) that avoids exposure of a user's identity, absent a clear suggestion that the statute clearly requires it. *See United States v. Hansen*, 599 U.S. 762, 781 (2023) (applying the "canon of constitutional avoidance" to avoid First Amendment concerns with statutory construction). Demands for identifying information about users "inevitabl[y]" carry a "deterrent effect on the exercise of First Amendment rights." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606–07 (2021). The way to avoid that problem is to limit demands to identify a user to the service that hosts the allegedly infringing content, which appropriately "balance[s] the plaintiffs' interest in the disclosures against the constitutional burden that disclosure would impose." *Twitter*, 608 F. Supp. 3d at 876. Gharavi, by contrast, seeks to open the doors to every service where that same user might engage in legitimate, lawful, anonymous speech that has no demonstrated connection to alleged copyright infringement.

Google's users depend on these presumptive privacy protections. When a user of any Google product creates an account or uses one of Google's services, his private data is governed by an applicable privacy policy. *See, e.g.,* ER-10 & n.3. As courts have accordingly recognized, users would be surprised to learn of any legal scheme that requires that a "company disclose[] users' identities to anyone who asks." *Twitter*, 608 F. Supp. 3d at 878. That is why subsection 512(h) must be understood to

have real limits. If it were otherwise, users would no longer entrust their data to critical online services that serve as an indispensable part of modern life. *See, e.g.*, N. Richards & W. Hartzog, *Privacy's Trust Gap*, 126 Yale L.J. 1180, 1188 (2017) (arguing that it is essential to "recognize the importance of information relationships in our networked, data-driven society," as well as providers' incentives to "build trust" with their users).

Recognizing that providers may be both stewards of their users' data and the recipients of compulsory legal process requiring them to disclose that data, Congress designed Section 512 to "balance the need for rapid response to potential infringement with the end-users' legitimate interests." *Rossi*, 391 F.3d at 1003 (quoting S. Rep. No. 105-190, at 21) (cleaned up). Section 512's careful design guards against erosion of user confidence in platforms' ability to protect their information—and thereby encourages the development of online speech and commerce that the DMCA was enacted to facilitate. This, too, supports the district court's appropriately narrow application of Section 512, as interpreted by *Cox*.

## CONCLUSION

The Court should affirm the decision of the district court.

October 27, 2026

Respectfully submitted,

*s/ Todd M. Hinnen*
Todd M. Hinnen
Lauren Tsuji
ASHURST PERKINS COIE US LLP
1301 2nd Avenue
Suite 4200
Seattle, Washington 98101
(206) 359.8000
Todd.Hinnen@ashurstperkins.com

Addison W. Bennett
ASHURST PERKINS COIE US LLP
2525 E. Camelback Road
Suite 500
Phoenix, Arizona 85016
(602) 351.8000

*Counsel for Respondent-Appellee Google LLC*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1(a) because this brief contains 12,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: October 27, 2026

*s/ Todd M. Hinnen*
Todd M. Hinnen

*Counsel for Respondent-Appellee Google LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2026, I electronically filed the foregoing Answering Brief of Respondent-Appellee Google LLC with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: October 27, 2026

*s/ Todd M. Hinnen*
Todd M. Hinnen

*Counsel for Respondent-Appellee Google LLC*

# Addendum

# ADDENDUM

**Page**

17 U.S.C. § 512 .......................................................................... Add. 1

**[§ 509. Repealed. Pub. L. 110–403, title II, § 201(b)(1), Oct. 13, 2008, 122 Stat. 4260]**

Section, Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2587; Pub. L. 105–80, § 12(a)(14), Nov. 13, 1997, 111 Stat. 1535, related to seizure and forfeiture.

**§ 510. Remedies for alteration of programming by cable systems**

(a) In any action filed pursuant to section 111(c)(3), the following remedies shall be available:

(1) Where an action is brought by a party identified in subsections (b) or (c) of section 501, the remedies provided by sections 502 through 505, and the remedy provided by subsection (b) of this section; and

(2) When an action is brought by a party identified in subsection (d) of section 501, the remedies provided by sections 502 and 505, together with any actual damages suffered by such party as a result of the infringement, and the remedy provided by subsection (b) of this section.

(b) In any action filed pursuant to section 111(c)(3), the court may decree that, for a period not to exceed thirty days, the cable system shall be deprived of the benefit of a statutory license for one or more distant signals carried by such cable system.

(Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2587; Pub. L. 106–113, div. B, § 1000(a)(9) [title I, § 1011(a)(1), (3)], Nov. 29, 1999, 113 Stat. 1536, 1501A–543.)

HISTORICAL AND REVISION NOTES

HOUSE REPORT NO. 94–1476

Section 509(b) specifies a new discretionary remedy for alteration of programming by cable systems in violation of section 111(c)(3): the court in such cases may decree that, "for a period not to exceed thirty days, the cable system shall be deprived of the benefit of a compulsory license for one or more distant signals carried by such cable system." The term "distant signals" in this provision is intended to have a meaning consistent with the definition of "distant signal equivalent" in section 111.

Under section 509(a), four types of plaintiffs are entitled to bring an action in cases of alteration of programming by cable systems in violation of section 111(c)(3). For regular copyright owners and local broadcaster-licensees, the full battery of remedies for infringement would be available. The two new classes of potential plaintiffs under section 501(d)—the distant-signal transmitter and other local stations—would be limited to the following remedies: (i) discretionary injunctions; (ii) discretionary costs and attorney's fees; (iii) any actual damages the plaintiff can prove were attributable to the act of altering program content; and (iv) the new discretionary remedy of suspension of compulsory licensing.

**Editorial Notes**

AMENDMENTS

1999—Pub. L. 106–113, § 1000(a)(9) [title I, § 1011(a)(1)], substituted "programming" for "programing" in section catchline.

Subsec. (b). Pub. L. 106–113, § 1000(a)(9) [title I, § 1011(a)(3)], substituted "statutory" for "compulsory".

**§ 511. Liability of States, instrumentalities of States, and State officials for infringement of copyright**

(a) IN GENERAL.—Any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity, shall not be immune, under the Eleventh Amendment of the Constitution of the United States or under any other doctrine of sovereign immunity, from suit in Federal court by any person, including any governmental or nongovernmental entity, for a violation of any of the exclusive rights of a copyright owner provided by sections 106 through 122, for importing copies of phonorecords in violation of section 602, or for any other violation under this title.

(b) REMEDIES.—In a suit described in subsection (a) for a violation described in that subsection, remedies (including remedies both at law and in equity) are available for the violation to the same extent as such remedies are available for such a violation in a suit against any public or private entity other than a State, instrumentality of a State, or officer or employee of a State acting in his or her official capacity. Such remedies include impounding and disposition of infringing articles under section 503, actual damages and profits and statutory damages under section 504, costs and attorney's fees under section 505, and the remedies provided in section 510.

(Added Pub. L. 101–553, § 2(a)(2), Nov. 15, 1990, 104 Stat. 2749; amended Pub. L. 106–44, § 1(g)(6), Aug. 5, 1999, 113 Stat. 222; Pub. L. 107–273, div. C, title III, § 13210(4)(C), Nov. 2, 2002, 116 Stat. 1909.)

**Editorial Notes**

CONSTITUTIONALITY

For information regarding the constitutionality of certain provisions of subsection (a) of this section, see the Table of Laws Held Unconstitutional in Whole or in Part by the Supreme Court on the Constitution Annotated website, constitution.congress.gov.

AMENDMENTS

2002—Subsec. (a). Pub. L. 107–273 substituted "122" for "121".

1999—Subsec. (a). Pub. L. 106–44 substituted "121" for "119".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective with respect to violations that occur on or after Nov. 15, 1990, see section 3 of Pub. L. 101–553, set out as an Effective Date of 1990 Amendment note under section 501 of this title.

**§ 512. Limitations on liability relating to material online**

(a) TRANSITORY DIGITAL NETWORK COMMUNICATIONS.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections, if—

(1) the transmission of the material was initiated by or at the direction of a person other than the service provider;

(2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;

(3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;

(4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and

(5) the material is transmitted through the system or network without modification of its content.

(b) SYSTEM CACHING.—

(1) LIMITATION ON LIABILITY.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider in a case in which—

(A) the material is made available online by a person other than the service provider;

(B) the material is transmitted from the person described in subparagraph (A) through the system or network to a person other than the person described in subparagraph (A) at the direction of that other person; and

(C) the storage is carried out through an automatic technical process for the purpose of making the material available to users of the system or network who, after the material is transmitted as described in subparagraph (B), request access to the material from the person described in subparagraph (A),

if the conditions set forth in paragraph (2) are met.

(2) CONDITIONS.—The conditions referred to in paragraph (1) are that—

(A) the material described in paragraph (1) is transmitted to the subsequent users described in paragraph (1)(C) without modification to its content from the manner in which the material was transmitted from the person described in paragraph (1)(A);

(B) the service provider described in paragraph (1) complies with rules concerning the refreshing, reloading, or other updating of the material when specified by the person making the material available online in accordance with a generally accepted industry standard data communications protocol for the system or network through which that person makes the material available, except that this subparagraph applies only if those rules are not used by the person described in paragraph (1)(A) to prevent or unreasonably impair the intermediate storage to which this subsection applies;

(C) the service provider does not interfere with the ability of technology associated with the material to return to the person described in paragraph (1)(A) the information that would have been available to that person if the material had been obtained by the subsequent users described in paragraph (1)(C) directly from that person, except that this subparagraph applies only if that technology—

(i) does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

(ii) is consistent with generally accepted industry standard communications protocols; and

(iii) does not extract information from the provider's system or network other than the information that would have been available to the person described in paragraph (1)(A) if the subsequent users had gained access to the material directly from that person;

(D) if the person described in paragraph (1)(A) has in effect a condition that a person must meet prior to having access to the material, such as a condition based on payment of a fee or provision of a password or other information, the service provider permits access to the stored material in significant part only to users of its system or network that have met those conditions and only in accordance with those conditions; and

(E) if the person described in paragraph (1)(A) makes that material available online without the authorization of the copyright owner of the material, the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringement as described in subsection (c)(3), except that this subparagraph applies only if—

(i) the material has previously been removed from the originating site or access to it has been disabled, or a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled; and

(ii) the party giving the notification includes in the notification a statement confirming that the material has been removed from the originating site or access to it has been disabled or that a court has ordered that the material be removed from the originating site or that access to the material on the originating site be disabled.

(c) INFORMATION RESIDING ON SYSTEMS OR NETWORKS AT DIRECTION OF USERS.—

(1) IN GENERAL.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds

expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) DESIGNATED AGENT.—The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

(3) ELEMENTS OF NOTIFICATION.—

(A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(B)(i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

(ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

(d) INFORMATION LOCATION TOOLS.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

(1)(A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

(e) LIMITATION ON LIABILITY OF NONPROFIT EDUCATIONAL INSTITUTIONS.—(1) When a public or other nonprofit institution of higher education is a service provider, and when a faculty member or graduate student who is an employee of such institution is performing a teaching or research function, for the purposes of subsections (a) and (b) such faculty member or graduate student shall be considered to be a person other than the institution, and for the purposes of subsections (c) and (d) such faculty member's or graduate student's knowledge or awareness of his or her infringing activities shall not be attributed to the institution, if—

(A) such faculty member's or graduate student's infringing activities do not involve the provision of online access to instructional materials that are or were required or recommended, within the preceding 3-year period, for a course taught at the institution by such faculty member or graduate student;

(B) the institution has not, within the preceding 3-year period, received more than two noti-

fications described in subsection (c)(3) of claimed infringement by such faculty member or graduate student, and such notifications of claimed infringement were not actionable under subsection (f); and

(C) the institution provides to all users of its system or network informational materials that accurately describe, and promote compliance with, the laws of the United States relating to copyright.

(2) For the purposes of this subsection, the limitations on injunctive relief contained in subsections (j)(2) and (j)(3), but not those in (j)(1), shall apply.

(f) MISREPRESENTATIONS.—Any person who knowingly materially misrepresents under this section—

(1) that material or activity is infringing, or

(2) that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

(g) REPLACEMENT OF REMOVED OR DISABLED MATERIAL AND LIMITATION ON OTHER LIABILITY.—

(1) NO LIABILITY FOR TAKING DOWN GENERALLY.—Subject to paragraph (2), a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless of whether the material or activity is ultimately determined to be infringing.

(2) EXCEPTION.—Paragraph (1) shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or to which access is disabled by the service provider, pursuant to a notice provided under subsection (c)(1)(C), unless the service provider—

(A) takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;

(B) upon receipt of a counter notification described in paragraph (3), promptly provides the person who provided the notification under subsection (c)(1)(C) with a copy of the counter notification, and informs that person that it will replace the removed material or cease disabling access to it in 10 business days; and

(C) replaces the removed material and ceases disabling access to it not less than 10, nor more than 14, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.

(3) CONTENTS OF COUNTER NOTIFICATION.—To be effective under this subsection, a counter notification must be a written communication provided to the service provider's designated agent that includes substantially the following:

(A) A physical or electronic signature of the subscriber.

(B) Identification of the material that has been removed or to which access has been disabled and the location at which the material appeared before it was removed or access to it was disabled.

(C) A statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled.

(D) The subscriber's name, address, and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal District Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notification under subsection (c)(1)(C) or an agent of such person.

(4) LIMITATION ON OTHER LIABILITY.—A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

(h) SUBPOENA TO IDENTIFY INFRINGER.—

(1) REQUEST.—A copyright owner or a person authorized to act on the owner's behalf may request the clerk of any United States district court to issue a subpoena to a service provider for identification of an alleged infringer in accordance with this subsection.

(2) CONTENTS OF REQUEST.—The request may be made by filing with the clerk—

(A) a copy of a notification described in subsection (c)(3)(A);

(B) a proposed subpoena; and

(C) a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

(3) CONTENTS OF SUBPOENA.—The subpoena shall authorize and order the service provider receiving the notification and the subpoena to expeditiously disclose to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged infringer of the material described in the notification to the extent such information is available to the service provider.

(4) BASIS FOR GRANTING SUBPOENA.—If the notification filed satisfies the provisions of subsection (c)(3)(A), the proposed subpoena is in proper form, and the accompanying declaration is properly executed, the clerk shall expeditiously issue and sign the proposed subpoena and return it to the requester for delivery to the service provider.

(5) ACTIONS OF SERVICE PROVIDER RECEIVING SUBPOENA.—Upon receipt of the issued subpoena, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), the service provider shall expeditiously disclose to the copyright owner or person authorized by the copyright owner the information required by the subpoena, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(6) RULES APPLICABLE TO SUBPOENA.—Unless otherwise provided by this section or by applicable rules of the court, the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum.

(i) CONDITIONS FOR ELIGIBILITY.—

(1) ACCOMMODATION OF TECHNOLOGY.—The limitations on liability established by this section shall apply to a service provider only if the service provider—

(A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures.

(2) DEFINITION.—As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

(A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

(B) are available to any person on reasonable and nondiscriminatory terms; and

(C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

(j) INJUNCTIONS.—The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section:

(1) SCOPE OF RELIEF.—(A) With respect to conduct other than that which qualifies for the limitation on remedies set forth in subsection (a), the court may grant injunctive relief with respect to a service provider only in one or more of the following forms:

(i) An order restraining the service provider from providing access to infringing material or activity residing at a particular online site on the provider's system or network.

(ii) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is engaging in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(iii) Such other injunctive relief as the court may consider necessary to prevent or restrain infringement of copyrighted material specified in the order of the court at a particular online location, if such relief is the least burdensome to the service provider among the forms of relief comparably effective for that purpose.

(B) If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:

(i) An order restraining the service provider from providing access to a subscriber or account holder of the service provider's system or network who is using the provider's service to engage in infringing activity and is identified in the order, by terminating the accounts of the subscriber or account holder that are specified in the order.

(ii) An order restraining the service provider from providing access, by taking reasonable steps specified in the order to block access, to a specific, identified, online location outside the United States.

(2) CONSIDERATIONS.—The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider—

(A) whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;

(B) the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;

(C) whether implementation of such an injunction would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations; and

(D) whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available.

(3) NOTICE AND EX PARTE ORDERS.—Injunctive relief under this subsection shall be available only after notice to the service provider and an opportunity for the service provider to appear are provided, except for orders ensuring the preservation of evidence or other orders having no material adverse effect on the operation of the service provider's communications network.

(k) DEFINITIONS.—

(1) SERVICE PROVIDER.—(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access,

or the operator of facilities therefor, and includes an entity described in subparagraph (A).

(2) MONETARY RELIEF.—As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

(*l*) OTHER DEFENSES NOT AFFECTED.—The failure of a service provider's conduct to qualify for limitation of liability under this section shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense.

(m) PROTECTION OF PRIVACY.—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

(1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

(2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

(n) CONSTRUCTION.—Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

(Added Pub. L. 105–304, title II, § 202(a), Oct. 28, 1998, 112 Stat. 2877; amended Pub. L. 106–44, § 1(d), Aug. 5, 1999, 113 Stat. 222; Pub. L. 111–295, § 3(a), Dec. 9, 2010, 124 Stat. 3180.)

**Editorial Notes**

REFERENCES IN TEXT

The Federal Rules of Civil Procedure, referred to in subsec. (h)(6), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

CODIFICATION

Another section 512 was renumbered section 513 of this title.

AMENDMENTS

2010—Subsec. (c)(2). Pub. L. 111–295 struck out ", in both electronic and hard copy formats" after "Internet" in concluding provisions.

1999—Subsec. (e). Pub. L. 106–44, § 1(d)(1)(A), substituted "Limitation on Liability of Nonprofit Educational Institutions" for "Limitation on liability of nonprofit educational institutions" in heading.

Subsec. (e)(2). Pub. L. 106–44, § 1(d)(1)(B), struck out par. heading "Injunctions".

Subsec. (j)(3). Pub. L. 106–44, § 1(d)(2), substituted "Notice and ex parte orders" for "Notice and Ex Parte Orders" in heading.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Pub. L. 105–304, title II, § 203, Oct. 28, 1998, 112 Stat. 2886, provided that: "This title [enacting this section and provisions set out as a note under section 101 of this title] and the amendments made by this title shall take effect on the date of the enactment of this Act [Oct. 28, 1998]."

**§ 513. Determination of reasonable license fees for individual proprietors**

In the case of any performing rights society subject to a consent decree which provides for the determination of reasonable license rates or fees to be charged by the performing rights society, notwithstanding the provisions of that consent decree, an individual proprietor who owns or operates fewer than 7 non-publicly traded establishments in which nondramatic musical works are performed publicly and who claims that any license agreement offered by that performing rights society is unreasonable in its license rate or fee as to that individual proprietor, shall be entitled to determination of a reasonable license rate or fee as follows:

(1) The individual proprietor may commence such proceeding for determination of a reasonable license rate or fee by filing an application in the applicable district court under paragraph (2) that a rate disagreement exists and by serving a copy of the application on the performing rights society. Such proceeding shall commence in the applicable district court within 90 days after the service of such copy, except that such 90-day requirement shall be subject to the administrative requirements of the court.

(2) The proceeding under paragraph (1) shall be held, at the individual proprietor's election, in the judicial district of the district court with jurisdiction over the applicable consent decree or in that place of holding court of a district court that is the seat of the Federal circuit (other than the Court of Appeals for the Federal Circuit) in which the proprietor's establishment is located.

(3) Such proceeding shall be held before the judge of the court with jurisdiction over the consent decree governing the performing rights society. At the discretion of the court, the proceeding shall be held before a special master or magistrate judge appointed by such judge. Should that consent decree provide for the appointment of an advisor or advisors to the court for any purpose, any such advisor shall be the special master so named by the court.

(4) In any such proceeding, the industry rate shall be presumed to have been reasonable at the time it was agreed to or determined by the court. Such presumption shall in no way affect a determination of whether the rate is being correctly applied to the individual proprietor.

(5) Pending the completion of such proceeding, the individual proprietor shall have the right to perform publicly the copyrighted musical compositions in the repertoire of the performing rights society by paying an interim license rate or fee into an interest bearing escrow account with the clerk of the court, subject to retroactive adjustment when a final rate or fee has been determined, in an amount equal to the industry rate, or, in the absence of an industry rate, the amount of the most recent license rate or fee agreed to by the parties.

(6) Any decision rendered in such proceeding by a special master or magistrate judge named under paragraph (3) shall be reviewed by the judge of the court with jurisdiction over the consent decree governing the performing rights society. Such proceeding, including such review,